**BARDEN DETROIT CASINO, L.L.C., a Michigan Limited Liability Company, Plaintiff,**

v.

**The CITY OF DETROIT, The Detroit City Council, Dennis W. Archer, Gilbert Hill, MaryAnn Mahaffey, Clyde Cleveland, Kenneth Cockrel, Jr., Sheila Cockrel, Kay Everett, Nicholas Hood, III, Brenda M. Scott, Alberta Tinsley–Talabi, The Michigan Gaming Control Board, Thomas Denomme, Paula Blanchard, Rich Davis, Geraldine Ford, and Michael Stacey, Defendants.**

No. 99–CV–72655.

United States District Court, E.D. Michigan, Southern Division.

July 22, 1999.

Robert M. Carson, Birmingham, MI, for plaintiff.

Morley Witus, Detroit, MI, Eric J. Eggan, E. Lansing, MI, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On May 25, 1999, Plaintiff, Barden Detroit Casino, L.L.C. ("BDC") initiated the instant lawsuit against the above-captioned State and Detroit Defendants challenging, *inter alia*, the constitutionality of the Casino Development Competitive Selection Process, Detroit City Code § 18–13–1, et seq. (the "Ordinance"), and the Michigan Gaming Control and Revenue Act, M.C.L.A. § 432.201, et seq. (the "Act"), which govern the selection and licensing of casino developers in the City of Detroit, respectively. In particular, BDC—which lost out in its bid to become one of three casino operators in Detroit to Detroit Entertainment, L.L.C. ("Atwater"),[1] Greektown Casino, L.L.C. ("Greektown"), and MGM Grand Detroit, L.L.C. ("MGM")— asserts that both the Ordinance and the Act award unconstitutional preferences to developers, particularly Atwater and Greektown, who lead the drive to bring casino gaming to Detroit.

The case is presently before the Court on BDC's May 25, 1999 Motion for Preliminary Injunction, predicated on First Amendment, equal protection, and substantive due process challenges to the Act and the Ordinance enumerated in counts I – VI of its Verified Complaint for Damages and for Injunctive Relief.[2] In light of the Sixth Circuit's recent holding in *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir.1999), finding that the Ordinance implicates core

---

1. Detroit Entertainment, L.L.C., is an entity comprised of the Atwater Casino Group and Circus Circus, Inc. For the purposes of this Opinion, the Court refers to this entity as "Atwater."

2. The Court also has before it separate Motions for Summary Judgment filed by the Detroit and the State Defendants on June 15, 1999 and June 22, 1999, respectively.

First Amendment rights and is, therefore, subject to strict scrutiny, BDC argues it can establish the requisite likelihood of success on the merits of its constitutional claims against the Detroit Defendants. As explained in greater detail, *infra,* BDC also asserts that the Act violates the Constitution both on its face and as applied.

In response, the Detroit Defendants concede the unconstitutionality of the Ordinance for the purposes of the instant motion *only,*[3] opting instead to rely on the following three threshold, and potentially dispositive, defenses: (1) a Consent and Release executed by Don Barden on behalf of BDC; (2) the equitable doctrine of laches; and (3) BDC's alleged inability to establish injury-in-fact. The Detroit Defendants further assert that even if the Court reaches the substance of BDC's constitutional challenges to the Ordinance, the balance of equities and the public interest militate strongly against any injunctive relief. With respect to the Act, the State Defendants assert that no "case or controversy" exists because the 1997 amendments to the statute render the state preference inoperative.

The Court met with the parties in chambers on June 17, 1999 and held a hearing at which it heard oral argument and took evidence with respect to the issues raised by BDC's Motion for Preliminary Injunction on June 28, 1999.[4] Without objection from the parties, and with the sole caveat that the Detroit Defendants expressly reserved the right, if necessary, to defend the constitutionality of the Ordinance at a later stage of the proceedings, the Court ordered the trial of this case, with respect to the final merits of BDC's request for injunctive relief, advanced and consolidated with the hearing on Plaintiff's Motion

for Preliminary Injunction pursuant to Fed.R.Civ.P. 65(a)(2). Having heard the oral arguments of counsel and the testimony of witnesses at the June 28, 1999 hearing, and having reviewed the briefs, deposition transcripts, and other supporting documents submitted by the parties, the Court makes the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II. FINDINGS OF FACT

Preliminarily, the Court observes that this litigation presents very close and finely-nuanced legal and factual questions of great complexity, novelty, and controversy that are of the highest import to the residents of the greater Detroit Metropolitan Region and the State of Michigan. The Court recognizes that because of the need for an expeditious resolution of this matter, all parties—and particularly their counsel—have worked with commendable diligence to prepare and present these issues to the Court for timely resolution. For this prodigious effort, the Court expresses its appreciation and endeavors in this decision to set forth its findings of fact and conclusions of law, and the analysis underlying each, as comprehensively as possible.

### A. The Parties

#### 1. Barden Detroit Casino, L.L.C.

Plaintiff, BDC, is a Detroit-based Michigan limited liability company, formed to engage in the development and operation of a casino gaming establishment in the City of Detroit. Don H. Barden resides in

---

**3.** Consistent with the Sixth Circuit's opinion in *Lac Vieux,* the Detroit Defendants specifically reserved the right to present proofs on whether the Ordinance satisfies the strict scrutiny standard.

**4.** The Court heard testimony from the following three witnesses at the June 28, 1999 hear-

ing: (1) Don Barden, BDC's Chairman and President; (2) Nelson Westrin, Executive Director of the Michigan Gaming Control Board; and (3) Phyllis James, City of Detroit Corporation Counsel. Detroit Mayor Dennis Archer's testimony was presented by video deposition taken on June 24, 1999.

the City of Detroit and serves as the Chairman and President of BDC.[5] Throughout the casino selection process, the law firm of Dykema Gossett, P.L.L.C., represented BDC.

### 2. The Detroit Defendants

For the purposes of this decision, the "Detroit Defendants" consist of the City of Detroit, Detroit Mayor Dennis W. Archer (the "Mayor"), the Detroit City Council, and the currently elected members of the Detroit City Council: Gilbert Hill, Maryann Mahaffey, Clyde Cleveland, Kenneth Cockrel, Jr., Sheila Cockrel, Kay Everett, Nicholas Hood III, Brenda Scott, and Alberta Tinsley–Talabi.

### 3. The State Defendants

Defendant Michigan Gaming Control Board (the "Board") is an agency of Michigan Government, M.C.L.A. § 432.204(1), established and organized pursuant to the Michigan Gaming Control and Revenue Act. The Board possesses the authority and duties enumerated in the Act, and all other powers necessary and proper to fully and effectively administer the Act for the purposes of licensing, regulating, and enforcing the system of casino gaming established under the Act. M.C.L.A. § 432.204(1). Defendants Thomas Denomme, Paula Blanchard, Rich Davis, Geraldine Ford, and Michael Stacey constitute

the currently serving members of the Board. For the purposes of this decision, the Court collectively refers to the Board and its individual members as the "State Defendants."

### B. The Michigan Gaming Control and Revenue Act ("the Act")

#### 1. The Original Act

On November 5, 1996, the state electorate approved Proposal E, a state ballot initiative legalizing casino gaming in the State of Michigan. In order to codify this successful referendum, the State Legislature passed, and the Governor signed into law, the Michigan Gaming Control and Revenue Act, M.C.L.A. § 432.201, et seq. The Act established the Michigan Gaming Control Board as the body authorized to issue licenses to operate casinos in Michigan, and effectively limited casino development to the City of Detroit by restricting gaming to cities: (1) with a population of at least 800,000 at the time a license is issued; (2) located within 100 miles of any other state or country in which gaming was permitted on December 5, 1996; and (3) where a majority of voters have expressed approval of casino gaming in the city. M.C.L.A. § 432.202(l).[6]

Although Proposal E, as it appeared on the November 5, 1996 ballot, made no mention of preferences for any class of license applicants,[7] the Act's licensing pro-

---

**5.** Don Barden also owns a "riverboat" casino in Gary, Indiana known as Majestic Star Riverboat.

**6.** With respect to the third prong, Detroit voters approved a city-wide ballot initiative in favor of casino gaming on August 2, 1994. This ballot initiative, known as Proposal B, was codified as part of the Detroit City Code as § 15–94 and § 16–94, effective August 19, 1994. At this time, however, casino gaming was still prohibited under Michigan law. [Stipulated Fact 8].

**7.** As it appeared on the November 5, 1996 general election ballot, Proposal E made no mention of preferences, providing simply:

**A Legislative Initiative to Permit Casino Gaming in Qualified Cities**
The Proposed law would:

1. Permit up to three gaming casinos in any city that meets the following qualifications: has a population of 800,000 or more; is located within 100 miles of any other state or country in which gaming is permitted; and has had casino gaming approved by a majority of the voters in the city.
2. Establish a Gaming Control Board to regulate casino gaming.
3. Impose an 18% state tax on gross gaming revenues.
4. Allocate 55% of tax revenue to the host city for crime prevention and economic development; allocate remaining 45% of tax funds to state for public education.

Should the proposed law be adopted? Yes/No. [Joint Exhibit 17].

cedures, in their original form, exempted certain preferred developers from the competitive bidding process and granted a tie-breaking preference to applicants that supported a city-wide ballot initiative in favor of casino gaming:

(a) The board shall issue a license to operate a casino to an applicant upon a determination by the board that the applicant is eligible for a casino license. The board shall find that an applicant is eligible for a casino license if all of the following criteria are met:

(1) prior to the date of application: (i) the applicant or its affiliates or affiliated companies was the initiator of any casino gaming proposal submitted for voter approval in the city in which the casino will be located and the voters approved the proposal; or (ii) the applicant was selected by the city pursuant to a competitive bidding process.

\* \* \* \* \* \*

(b) No more than three (3) licenses shall be issued by the board in any city. In the event that more than three (3) applicants meet the criteria provided for in Section 6(a) of this Act, licenses shall first be issued to applicants which submitted any casino gaming proposal for voter approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal.

M.C.L.A. § 432.206 (1996) (amended 1997).

## 2. The Amended Act

Effective July 17, 1997, the Act was amended to eliminate the provision previously codified at § 432.206(a) exempting preferred developers from the competitive bidding process. While the Amended Act retained the tie-breaking preference at § 432.206(3), the viability of this preference was called into doubt by the addition of a new subsection, § 432.206(2), which effectively limits a city to submitting no more than 3 certified development agreements to the Board at one time. As amended, § 432.206 now reads, in pertinent part:

(1) The board shall issue a casino license to a person who applies for a license . . . who the board determines is eligible and suitable to receive a casino license under this act and the rules promulgated by the board. It is the burden of the applicant to establish by clear and convincing evidence its suitability as to character, reputation, integrity, business probity, experience, and ability, financial ability and responsibility, and other criteria as may be considered appropriate by the board. The criteria considered appropriate by the board shall not be arbitrary, capricious, or contradictory to the expressed provisions of this act. A person is eligible to apply for a casino license if all of the following criteria are met:

(a) The applicant proposes to locate the casino in a city where the local legislative body enacted an ordinance approving casino gaming that may include local ordinances governing casino operations, occupational licensees and suppliers which are consistent with this act and rules promulgated by the board.

(b) The applicant entered into a certified development agreement with the city where the local legislative body enacted an ordinance approving casino gaming.

(c) The applicant or its affiliates or affiliated companies has a history of, or a bona fide plan for, either investment or community involvement in the city where the casino will be located.

(2) **A city shall not certify or submit and have pending before the board more than 3 certified development agreements.** If an applicant is denied a casino license by the board, the city may then certify a development agreement with another applicant and submit the certified development agreement to the board. Nothing in this act shall be con-

strued to prevent the city from entering into more than 3 development agreements.

(3) No more than three (3) licenses shall be issued by the board in any city.... In evaluating the eligibility and suitability of all applicants under the standards provided in this act, the board shall establish and apply the standards to all applicants in a consistent and uniform manner. **In the event that more than three (3) applicants meet the standards for eligibility and suitability provided for in subsection (4) and (5), licenses shall first be issued to those eligible and suitable .applicants which submitted any casino gaming proposal for voter approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal.**[8]

M.C.L.A. § 432.206 (emphasis added).

To the extent the tie-breaking preference is effective, the parties do not dispute that Atwater and Greektown are the only entities that satisfy the requirements of § 432.206(3).

## C. *The Ordinance*

On June 18, 1997, the Detroit City Council adopted an Ordinance entitled the Casino Development Competitive Selection Process, Detroit City Code § 18–13–1, et seq., which authorizes the Mayor to select three casino developers to enter into certified development agreements with the city pursuant to a competitive request for proposal ("RFP/Q") process. §§ 18–13–3(a), 18–13–7(a). The Ordinance provides a preference for developers who took the initiative to bring casino gaming to Detroit, and lists "preference qualification" as one of several broad factors the Mayor

should consider in reviewing proposals.[9] §§ 18–13–1, 18–13–3. More specifically, the Ordinance Statement of Intent provides:

> In selecting developers of casinos, it is in the best interest of the city to provide a preference to those developers who took the initiative to facilitate the development of casino gaming in the City of Detroit by proposing a casino gaming proposal approved by the voters of the city (City Ordinance 15–94 and 16–94), and who actively promoted and significantly supported the state initiative authorizing gaming.

Detroit City Code § 18–13–1(i).

Section 18–13–2 defines "preference" as a "more favorable position given to one prospective developer over another in the process established to select a designated developer," and further elaborates on the parties entitled to a preference as follows:

> (a) In considering proposals and in selecting a prospective developer with whom the mayor or his designee will negotiate a development agreement, a prospective developer is entitled to a preference if:
>
> (1) Its proposal meets the criteria established by this chapter and by the request for proposals;
>
> (2) It was the initiator of a casino gaming proposal which was approved by the voters of this city prior to January 1, 1995; and
>
> (3) It made significant contributions to the development of gaming within the city by actively promoting and significantly supporting a state initiative authorizing gaming.
>
> (b) Notwithstanding any other provision of this chapter, no more than one prefer-

---

8. Subsections (4) and (5) set forth the criteria that will render an applicant ineligible for a casino license and the factors that the Board may consider in determining whether to grant a casino license. These provisions are not at issue in this litigation.

9. Without limiting the Mayor's discretion, the Ordinance directs the Mayor to consider the following seven broad criteria in reviewing proposals: (1) Background and experience; (2) Financial; (3) Concept; (4) Economic development; (5) Infrastructure improvements; (6) Social; and (7) Preference qualification. § 18–13–3(c).

ence shall be awarded to prospective developers who proposed city Ordinance No. 15–94, even if more than one prospective developer claims entitlement to such preference.

(c) Notwithstanding any other provision of this chapter, no more than one preference shall be awarded to prospective developers who proposed city Ordinance No. 16–94, even if more than one prospective developer claims entitlement to such preference.

Detroit City Code § 18–13–6. It is undisputed that while BDC did not qualify for a preference, Atwater and Greektown satisfied the § 18–13–6 preference requirements.[10]

## D. *The RFP/Q and Selection Process*

### 1. *The RFP/Q Process*

Consistent with the Ordinance, the City formulated a competitive selection process which was divided into two stages, RFP I and RFP II. On June 23, 1997, the City published RFP I, which required prospective developers to submit detailed casino proposals and a $50,000 application fee by August 1, 1997. [Exhibit 34]. Eleven developers, including BDC, responded to RFP I.

### 2. *The Consent and Release*

All developers that responded to RFP I were required to execute a Consent and Release, which in its entirety provides:

### CONSENT AND RELEASE

WHEREAS, the City of Detroit is soliciting requests for the City of Detroit/Casino Project pursuant to Phase One and Phase Two documents issued by the City of Detroit, together with all alterations, supplements or amendments thereto (collectively, the "RFP/Q").

WHEREAS, to evaluate the personal, business and financial qualifications and professional capabilities and standing of each Proposer, the Proposer's Substantial Owners, Managers, the Substantial Owners of its Managers, their respective Affiliates and their respective Key Persons (each, a "Releasor" and collectively, the "Releasors"), the City of Detroit requires certain information about each Releasor which could be considered confidential and/or proprietary ("Information").

WHEREAS, the collection of Information by the City of Detroit is essential to select the highest quality Proposal for the City of Detroit.

WHEREAS, some of the Information may be collected directly or indirectly from the Releasor and/or other Releasors.

WHEREAS, other Information may be collected directly or indirectly from others such as law enforcement agencies, courts, gaming and other regulatory bodies, former employees, and financial sources.

NOW, THEREFORE, the Releasor, in consideration of the City of Detroit's accepting for review a Proposal in which Releasor has an economic interest and other valuable consideration the sufficiency of which is hereby acknowledged, agrees as follows:

1. The definitions contained in the RFP/Q are incorporated herein by reference.

2. The Releasor hereby consents and agrees to abide by all of the City of Detroit's terms, conditions, rules and policies concerning the RFP/Q.

3. The Releasor agrees that the City of Detroit does not acknowledge or agree that any of the Information is confidential and/or proprietary.

---

10. Section 18–13–7 provides that "if the mayor does not enter into a development agreement with a prospective developer entitled to a preference pursuant to section 18–13–6 of this chapter, the mayor must state in writing and with particularity the basis upon which he determined that such proposal was not in the best interest of the city."

4. Information collected will be used in at least the following ways:

a. To evaluate Releasor's personal, financial and business history;

b. To evaluate Releasor's personal, financial and business integrity, and criminal history, if any; and

c. To evaluate Releasor's professional qualifications and capabilities and demonstrated past performance.

5. The City of Detroit may use the Information in any regulatory decision with respect to involvement in gaming in the City of Detroit and may provide this Information to any existing or new licensing or regulatory body with respect to involvement in gaming in Michigan.

6. Information may be shared with other government agency officials or advisers who may work with the City of Detroit in the RFP/Q evaluation process.

7. The City of Detroit may provide the Information to the Board or any successor or replacement thereto.

8. The City of Detroit and/or the Board may share the Information with other jurisdictions with which it has formal agreements.

9. The City of Detroit may provide such Information to law enforcement agencies for gaming related investigations or clearances.

10. The City of Detroit is controlled by certain statutes of the United States and State of Michigan and divisions thereof. The Releasor acknowledges that those statutes may provide access by third parties to the Information obtained regarding the Releasor.

11. The Releasor, and his, her or its heirs, executors, administrators, successors and assigns, hereby release the City of Detroit including all departments, agencies and commissions thereof, and their respective principals, agents, consultants, attorneys, advisors, employees, officers and directors (the "Releasees"), and hold each of them harmless from any damages, claims, rights, liabilities, or causes of action, which the Releasor ever had, now has, may have or claim to have, in law or in equity, against any or all of the Releasees, arising out of or directly or indirectly related to the (i) RFP/Q process and the selection and evaluation of Proposals submitted in connection therewith; (ii) release or disclosure of any Information whether intentional or unintentional; and (iii) use, investigation of, or processing of the Information.

12. The undersigned Releasor has read and understands this Consent and Release and hereby authorizes the direct and indirect collection of, and consents to the use and disclosure of, the Information as described herein.

[Joint Exhibit 36].

As part of his RFP I proposal, Don Barden executed the Consent and Release on behalf of BDC and various other Barden controlled entities first on July 25, 1997 and again on August 1, 1997.[11] [Joint Exhibit 36].

### 3. *The Selection Process*

On August 23, 1997, the Mayor invited seven of the eleven prospective developers, including BDC, to proceed to RFP II.[12] All seven of these developers submitted proposals along with the $250,000 RFP II fee. On November 7, 1997, the Mayor eliminated BDC's proposal by narrowing the field to Atwater, Greektown, MGM, and Mirage. A final decision was then reached on November 20, 1997, when the Mayor announced the City's intent to negotiate certified development agreements with Atwater, Greektown, and MGM. The State

---

**11.** Mr. Barden signed the Consent & Release one (1) time on July 25, 1997 and twenty (20) times on August 1, 1997.

**12.** The seven developers invited to participate in RFP II were Atwater, BDC, Greektown, MCD Gaming Corp. ("Mirage"), MGM, Trump Motor City Hotel Casino, and Paradise Valley Rio.

and the Detroit Defendants have raised important issues as to why BDC did not bring suit challenging the selection process at this time.[13]

At his June 24, 1999 deposition, Mayor Archer testified extensively with respect to the application of preferences in the selection process. While indicating that Atwater and Greektown were eligible for preferences throughout the RFP/Q process, the Mayor unequivocally testified that no preference was applied until after the applicant field was reduced from seven to four. [Archer Dep., pp. 33, 63, 65]. Among the final four, the Mayor further testified that while the preference played no role in the final selection of Atwater, the preference did enable Greektown to prevail over Mirage. [Archer Dep., p. 57]. With respect to Atwater, the Mayor denied knowledge that Circus Circus agreed to pay Atwater $13 million for an assignment of preference rights, a fact which is not now contested. However, he acknowledged that the addition of Circus Circus substantially strengthened the Atwater group's bid:

Q. [By Mr. Carson] Am I correct in my understanding that in the past you've stated that Atwater received no preference?

A. [By Mayor Archer] That's correct.

Q. Are you aware that to satisfy the local Atwater group's capital contribution to that casino entity, that it assigned its preference rights?

A. No.

\*     \*     \*     \*     \*     \*

Q. And that was the full extent of its capital contribution?

A. No, I can't say that I knew that at all.

Q. And that in addition to that, in consideration for that assignment, that the local people got—or Circus Circus agreed to pay additionally $13 million, five million cash and eight million when the casino license is issued?

A. I don't know if—I don't recall sitting here whether or not that has been disclosed to me, but let me just indicate the following. Atwater is entirely different than the Atwater that proposed the, excuse me, ballot initiative for August 2nd, 1994. There have been, in my view, additions and deletions to what was commonly referred to as Atwater, but the group guts or the core group, I should say would be more appropriate, at least in my view, the proponents, namely Herb Strather, Nellie Varner and others, are the ones who were the principal outspoken advocates that began the August 2nd, 1994 initiative.

Q. Who are the others that you can recall?

\*     \*     \*     \*     \*     \*

A. I don't know all of the them, let's put it that way.... I was aware it seems to me that one time there was either a verbal or written agreement between Atwater and Mirage, and that didn't last, and it was clear that Atwater by and of themselves, whoever they were, did not have an entity that was in the casino gaming business, so I was

---

**13.** At the June 28, 1999 hearing, Mr. Barden explained BDC's delay in filing suit as follows:

MR. DRIKER: When did you decide to challenge the preference, Mr. Barden?

MR. BARDEN: After consultation with my lawyers and after I had tried every other avenue of redress from the time the decision was made on the selection process. I thought that I'd have a fair shake [before]

City Council because I know City Council members have publicly stated that they'd like to see local involvement, et cetera, in the process. Even though we were prohibited from communicating with the City Council, which I also thought was unfair, because I couldn't even state my case to them then.

[Hearing Transcript, p. 145; See also pp. 198–200].

not at all surprised to see them partner up with or look for somebody who had casino gaming experience.

Q. The so-called Atwater group was at least nominally one that was entitled to a preference under the Detroit ordinance; is that correct?

A. They would have been, but it was not needed.

Q. I'm saying they were entitled, is my question?

A. Well, I don't know to quibble with you. I think in contemplation, if you were to ask the authors of their intent of the ordinance, I'm sure Atwater was contemplated, but in reality Atwater, now known I think as Detroit Entertainment, did not need a preference. They were strong enough that they didn't need it.

Q. And indeed you made that judgment?

A. Yeah. I was the one who made the recommendation to City Council, yes.

Q. So at the time you made the judgment, you knew that Atwater nominally was entitled to a preference, but you made the judgments they did not need it or it did not need it?

A. It clearly didn't need it.

\* \* \* \* \* \*

Q. Would it be safe to say, Mr. Mayor, that if the Atwater group, Detroit Entertainment, but the Atwater group was composed of all its constituents, other than Circus Circus, that you would not have viewed it in the same way and would not have selected it?

A. That calls for conjecture because they didn't present it that way, and so since they didn't present it that way I couldn't evaluate it as I evaluated everybody else. What I had to evaluate was that which was written and given to me to take a look at so I can't divorce it out, sorry.

Q. You're saying that the question as framed is so speculative that you could not make a judgment sitting here today that that group, absent Circus Circus, would have failed?

A. I don't know that because I hadn't seen or, you know, nothing has come before me that would suggest otherwise. Now, one could speculate taking your hypothetical and saying if people who had no casino experience and came in and said, gee, we'd like to do this casino, we have put something on the ballot in August of 1994, we were successful there, we helped to put this on a statewide ballot and collectively we have no experience of running a casino, we've had no experience running a complex that the City has in mind, if that was it standing alone, nothing else, and no financial ability to build out a casino and none of the other criteria that's listed in all the criteria, they would not have been chosen.

[Archer Dep., pp. 39–41, 43–45].

#### 4. *City Council Ratification*

Following the Mayor's announcement of the selected developers, the City proceeded to negotiate development agreements with Atwater, Greektown, and MGM, which agreements were executed on March 12, 1998 and submitted to the City Council for approval pursuant to Detroit City Code § 18–13–8.[14] As part of the

14. As part of the RFP/Q process, prospective developers were required to submit detailed proposals linked to one of three proposed sites (the Grand River site, the Washington Boulevard site, and the Greektown site), or an alternative fourth site (the Central Business District site). In March 1998, during the course of negotiating development agreements with the selected developers, the Mayor announced his decision to move the location of the casino complexes to a 58 acre site along the Detroit River bounded by Jefferson

negotiation process, each of the selected developers agreed to effectively cross-condition—or "tie-bar"—the development agreements by making the effective date of each agreement dependent on the City Council's approval of the other two agreements. More specifically, Art. I, § 1.1(a)(62) of each of the three development agreements provides:

"Effective Date" means the date on which all of the following have been accomplished: the agreement has been executed by all parties hereto and the City Council has duly approved and certified the *last* of the following: (i) this Agreement; and (ii) the development agreements of each of the Other Land–Based Casino Developers.

[Joint Exhibits 13–15, emphasis added]. On April 9, 1998, the City Council approved each of the three development agreements. Thereafter, the City forwarded the agreements to the Board on April 17, 1998, enabling the Board to accept and begin processing the selected developers' license applications.[15]

### E. Subsequent Developments

#### 1. Proposal 1

Following the City Council's approval of the development agreements, Community Coalition, a Detroit-based organization advocating for increased local ownership of the casino projects, succeeded in placing a ballot initiative on the August 1998 citywide ballot. The ballot initiative, known as Proposal 1, sought to amend the Ordinance to assure that a "Qualified Detroit–Based Developer" received one of the development agreements.[16] BDC satisfied the requirements of a "Qualified Detroit–Based Developer," which Proposal 1 defined as follows:

QUALIFIED DETROIT–BASED DEVELOPER means a proposed developer, fifty (50%) percent or more of which is owned, directly or indirectly, by one or more individuals who meet each of the following criteria: (a) are (or were) residents of the City of Detroit at the time the submission of the proposed developer's proposal was (or is) submitted and for at least one year preceding such time, (b) have, prior to the date of the submission of the proposed developer's proposal, owned and operated a Detroit–Based Business, and (c) for a period of one (1) year or more, have been licensed by a state other than the State of Michigan to conduct casino operations (including riverboat gaming operations). For purpose of subclause (c), an individual shall be deemed to be licensed if it owns directly or indirectly, more than (50%) percent of a company that has been licensed to conduct casino operations (including riverboat gaming operations) by a state other than the State of Michigan.

[Hearing Exhibit 6].

At the June 28, 1999 hearing, Mr. Barden testified that while he played no direct role in Community Coalition, he supported Proposal 1 and financed the Coalition's efforts to amend the Ordinance. [Hearing Transcript, pp. 203–204]. Despite these efforts, Detroit voters overwhelmingly re-

---

Avenue, Atwater Street, Riopelle Street, and Chene Street (the Riverfront site). The details of the decision to move the casinos to the Riverfront site are not pertinent to the federal constitutional claims presently before the Court.

**15.** The Board commenced the investigative phase of the application process on July 21, 1998. [Stipulated Fact 46].

**16.** Proposal 1 would have amended § 18–13–1 of the Ordinance to provide:

In selecting developers of casinos, it is in the best interest of the City to select at least one designated developer who is a Qualified Detroit–Based Developer, it being recognized that such selection would promote and encourage resident ownership, help assure a long term commitment to the City by the owners of the developer, increase the taxes that owners of the developer can be expected to pay to the City, and enhance the likelihood that the profits derived by owners of developers are appropriately reinvested in the City.

[Hearing Exhibit 6].

jected Proposal 1 on August 4, 1998, choosing instead to approve another ballot initiative, Proposal 2, that effectively affirmed the selection criteria set forth in the Ordinance.

### 2. *Temporary Casinos*

Despite the fact that each of the certified development agreements provides, *inter alia*, that "[N]o right shall be conferred or obligation imposed under this Agreement unless and until ... the Board has issued its Certificate of Suitability pursuant to the Act," MGM began construction of a temporary casino on November 20, 1998. Greektown and Atwater commenced construction of their temporary casino facilities on February 1, 1999 and February 8, 1999, respectively.[17] [Stipulated Fact 47].

At the June 28, 1999 hearing, Nelson Westrin, Executive Director of the Board, explained the current status of the selected developers' license applications as follows:

> MR. DRIKER: All right. Could you tell his Honor what status the licensing of the three casino applicants is right as of today where things stand in a nutshell?
>
> MR. WESTRIN: The Gaming Control Board has completed the background investigated [sic] of the MGM Grand, L.L.C. application. We commenced the required public investigator hearing on June 21st. Evidence was closed, and the Board is reconvening the hearing on

July 20th for a final argument.[18] And to take a[v]ote on suitability; and, if appropriate, on whether or not a license should issue.

> THE COURT: As to MGM.?
>
> MR. WESTRIN: As to MGM Grand.
>
> THE COURT: Where are you with respect to the other two selectees?
>
> MR. WESTRIN: The background investigations which are required are still ongoing as to both of the other applicants. The Detroit Entertainment L.L.C. investigation is projected to be completed sometime in late July, early August. The Greektown Casino L.L.C. application investigation is projected to [be] complete[d] sometime [in] late October, early November.

[Hearing Transcript, pp. 228–229].

### F. *Other Relevant Litigation*

#### 1. *Lac Vieux*

BDC models its constitutional challenges in the instant case on a similar suit originally filed in the United States District Court for the Western District of Michigan by the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Lac Vieux") against the Board, the City of Detroit, the Mayor, and the City Council on February 25, 1997. As amended, Lac Vieux's Complaint alleged, *inter alia*, that the preferences in the Act and the Ordinance violated Lac Vieux's constitutional rights to free expression and equal protection.[19] On Oc-

---

**17.** Each of the selected developers has paid a $3.66 million Advance Municipal Services Fee to the City of Detroit. [Stipulated Fact, 47]. In addition, the selected developers have made significant investments in their temporary casinos. For example, John Redmond, Vice Chairman of MGM Grand Detroit, L.L.C., submitted an affidavit to the Court indicating that as of March 31, 1999, MGM had spent in excess of $80 million on its temporary facility, with an expected total cost of more than $206 million. [Redmond Affidavit, ¶ 7].

**18.** The Board meeting previously scheduled for July 20, 1999 is now set for July 28, 1999.

**19.** Among other claims, Lac Vieux's original complaint filed on February 25, 1997 sought to have the Act declared unconstitutional on the grounds that it violated the takings, equal protection, and due process clauses of the federal constitution, and that the Act constituted an unconstitutional delegation of legislative authority to the City. Following the enactment of the amended Act and the Ordinance in June of 1997, Lac Vieux twice amended its Complaint. The first change incorporated challenges to the amended Act and the Ordinance into the case. In the second amended complaint, Lac Vieux dropped certain claims, but added claims that both the Act and the Ordinance violated the First

tober 31, 1997, Judge Robert Holmes Bell granted summary judgment in favor of the Defendants, finding that Lac Vieux did not have standing to bring its equal protection challenges and that neither the Act nor the Ordinance implicated the First Amendment.[20] The district court further held that even if Lac Vieux had standing, its equal protection claims could not survive rational basis review. *Lac Vieux*, 172 F.3d at 403.

However, in a unanimous decision issued on April 12, 1999, *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir.1999), the Sixth Circuit reversed the District Court's summary disposition of Lac Vieux's First Amendment and equal protection challenges to the Ordinance, and remanded these claims to the District Court for further proceedings. In particular, the Sixth Circuit found that Lac Vieux did have standing to bring both First Amendment and equal protection challenges to the Ordinance, and that the Ordinance does implicate important First Amendment concerns and is, therefore, subject to the very high constitutional standard of strict scrutiny by the Court:

> Although the city ordinance in this case does not directly prohibit or limit speech, it does implicate the First Amendment. The ordinance grants benefits and imposes burdens according to whether an individual or entity sufficiently supported a particular political issue. Specifically, it grants a preference to developers who initiated a prior local casino gaming proposal and actively promoted and significantly supported

a state initiative authorizing gaming. The ordinance thereby denies a preference in the bidding process to certain developers on the basis of the content of their political speech, a category of speech which has been specifically recognized by the Supreme Court as particularly valuable and thereby carefully protected. It does not matter that the ordinance involves prior speech rather than prospective speech or a preference rather than a guarantee, because it imposes a burden based on the content of political speech and, therefore, implicates the First Amendment.

> \*   \*   \*   \*   \*   \*

> [W]e conclude that the ordinance is content-based and is therefore subject to strict scrutiny.[21]

*Id.* at 409–410 (internal quotations and citations omitted).

In addition, the Sixth Circuit found that the District Court erred by subjecting Lac Vieux's equal protection challenge to the Ordinance to rational basis review:

> A statute challenged on equal protection grounds will be subject to strict scrutiny when the statute involves a suspect classification or has an impact on a fundamental right. If the statute does not involve a suspect classification or affect a fundamental right, then it will be subject to rational basis review. The district court found that the ordinance did not implicate the First Amendment, or any other fundamental right for that matter, and therefore applied rational basis review. However, in view of our holding that the ordinance does affect

Amendment by awarding preferences to parties "for their political support of a particular side of a controversial issue." *Lac Vieux*, 172 F.3d at 401–402.

20. With respect to standing to challenge the Ordinance on equal protection grounds, Judge Bell found that Lac Vieux, which did not bid on the Detroit casinos, did not sufficiently allege that it was ready and able to submit a proposal to the City. *Lac Vieux*, 172 F.3d at 403–404. The District Court did not

address Lac Vieux's standing to bring an equal protection challenge against the Amended Act. *Id.* at 406.

21. In order to satisfy the strict scrutiny test, the government bears the very heavy burden of showing that a regulation is narrowly tailored to serve a compelling state interest. *See Lac Vieux*, 172 F.3d at 409 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–382, 403, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

rights under the First Amendment, it follows that it is subject to strict scrutiny review—because it implicates a constitutionally protected fundamental right, the right to freedom of speech. *Id.* at 410 (internal citations omitted).

With respect to the State Act, however, the Sixth Circuit found that Lac Vieux lacked standing to bring either First Amendment or equal protection challenges. In reaching this decision, the panel reasoned:

> [T]he amended act appears to render the [Act's] preference ineffective. If the preference is ineffective, there can be no injury and no 'case or controversy.' Although Lac Vieux attempts to rebut the defendants' and the intervenors' contention that the preference is ineffective, we find its argument neither fully developed nor convincing. We therefore hold that because the preference in the amended act is ineffective, Lac Vieux does not have standing to bring an equal protection challenge to the amended act.

*Id.* at 406.[22]

### 2. *NewCentury*

On October 7, 1997, NewCentury Detroit, L.L.C. ("NewCentury"), one of the four original bidders that the Mayor did not invite to respond to RFP II, filed suit in the United States District Court for the Eastern District of Michigan challenging, *inter alia,* the preferences in the Act and the Ordinance on First Amendment and equal protection grounds.[23] *NewCentury Detroit L.L.C. v. City of Detroit,* Case No. 97–75154. Following a November 3, 1997 hearing, Judge Nancy G. Edmunds issued an Order Denying Plaintiff's Motion for Preliminary Injunction on November 6, 1997.[24] In reaching this decision, Judge Edmunds concluded that the Ordinance did not implicate NewCentury's First Amendment rights, and that the Consent and Release executed by all of the developers who responded to RFP I, including BDC, undermined NewCentury's likelihood of success on the merits. [Order Denying Motion for Preliminary Injunction, pp. 7, 10].

Thereafter, the Court permitted counsel for NewCentury to withdraw, and no responses were filed to the Defendants' January 15, 1998 motions for summary judgment. On June 3, 1998, Judge Edmunds issued an Order Granting Defendants' Motions for Summary Judgment. With respect to NewCentury's claims directed at the State, the Court found that the 1997 amendments to the Act rendered the state preference inoperative. [Order Granting Summary Judgment, pp. 12–13]. In addition, the Court found that the Consent and Release barred all claims against the City:

> A release is valid if it is fairly and voluntarily made. *See Newton v. Rumery,* 480 U.S. 386, 417, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987); *Salmeron v. United States,* 724 F.2d 1357, 1361 (9th Cir. 1983) ("release of claims for violations of civil and constitutional rights must be voluntary, deliberate and informed"). The Court finds no indication that the RFP/Q releases fail to meet this standard. The document language is clear and unambiguous; the releases specifically informed Plaintiffs that they were waiving any and all claims regarding the RFP/Q process. Plaintiffs' complaint presents no allegation of fraud, coercion, or other misconduct regarding the City's solicitation of signatures for the release. Thus, the record before this Court is

---

**22.** The Sixth Circuit applied the identical standing analysis to Lac Vieux's First Amendment challenge to the Act. *Lac Vieux,* 172 F.3d at 408.

**23.** The named defendants in *NewCentury* included the City of Detroit, the Mayor, the City Council and its individual members, the Board and its individual members, Atwater, and Greektown.

**24.** While originally requesting injunctive relief against both the State and the City, at oral argument NewCentury informed the Court that their Motion for Preliminary Injunction was directed at the City of Detroit.

bereft of any evidence of unfairness. Moreover, Plaintiffs are sophisticated parties with legal counsel. As such, the Court would find it difficult to countenance a claim of involuntariness, overreaching, or unconscionability. Rather, the Court finds that the release is not impugned by any unfairness or involuntariness and that it therefore remains valid and binding on the Plaintiffs.

[Order Granting Summary Judgment, pp. 7–8, internal footnote and citation omitted]. NewCentury did not pursue an appeal of Judge Edmund's decision to the Sixth Circuit.

### G. Procedural Summary

On May 25, 1999, approximately six weeks after the Sixth Circuit issued its opinion in *Lac Vieux*, BDC initiated the present lawsuit by filing a fifteen-count Verified Complaint for Damages and for Injunctive and Declaratory Relief. Counts I–VI, the predicate for BDC's instant request for injunctive relief, set forth First Amendment, equal protection, and substantive due process challenges to the Act and the Ordinance. In Count VII, BDC asserts that both the Act and the Ordinance violate the Michigan Constitution's prohibition against special legislation. Count VIII presents a § 1983 action against all Defendants based on the aforementioned federal constitutional challenges. Finally, Counts IX – XV present a variety of state law contract and tort claims against the Detroit Defendants.

That same day, BDC filed the instant Motion for Preliminary Injunction requesting that the Court declare the Act and the Ordinance unconstitutional and enjoin the opening of the temporary casinos. Pursuant to the Court's May 25, 1999 Show Cause Order, the Detroit and the State

**25.** With the Court's permission, the Defendants also filed separate Supplemental Briefs.

**26.** Following the June 28, 1999 hearing, the Court directed the parties to submit post-hearing briefs on the following two issues *only:* (1) the application of *G & V Lounge,*

Defendants filed Responses to Plaintiff's Motion for Preliminary Injunction on June 15, 1999, and BDC filed its Reply Briefs on June 22, 1999.[25] In addition, the Detroit and the State Defendants filed separate Motions for Summary Judgment on June 15, 1999 and June 22, 1999, respectively.[26] The parties also filed a Stipulated Order of Facts and Exhibits on June 30, 1999.

Under the supervision of the Court, the parties have also engaged in limited mutual discovery, exchanging numerous documents relevant to the issues in this case. At the direction of the Court, the parties have produced to the Court voluminous documents under seal upon which claims of privilege have been asserted. These documents were accompanied by annotated privilege logs describing the documents and the claimed privilege. Copies of the logs were served on opposing counsel. The Court has carefully reviewed each and every document upon which a privilege has been asserted. With the exception of those documents expressly indicated by the Court in its *in camera* hearing with the parties on July 14, 1999, the Court hereby finds that all privileges claimed by both parties have been properly asserted. Thus, the Court has not relied on any of these documents in reaching its decision, and these documents shall remain under seal.

### III. CONCLUSIONS OF LAW

### A. Standards Applicable to Motions for Preliminary Injunction

██ In considering a request for a preliminary injunction, the Court must consider and balance the following four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury in the absence of

*Inc. v. Michigan Liquor Control Commission,* 23 F.3d 1071 (6th Cir.1994) and *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) to the case at hand; and (2) the scope of any possible injunctive relief in this matter.

an injunction; (3) whether an injunction will cause substantial harm to others; and (4) whether an injunction would serve the public interest. *G & V Lounge, Inc. v. Michigan Liquor Control Commission,* 23 F.3d 1071, 1076 (6th Cir.1994); *In re De-Lorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). Fed.R.Civ.P. 52 requires the Court to make specific findings as to each factor "unless fewer are dispositive of the issue." *Id.*

## B. *BDC's Claims Against the Detroit Defendants*

### 1. *The Equities*

Because both sides have asserted that the equities of this case militate in their favor, as an initial matter, the Court wishes to make several comments regarding the parties to this lawsuit and the general equities of the case. Having thoroughly and carefully reviewed the record, it is clear to the Court that the equities in this case favor neither BDC nor the Detroit Defendants.

On the one hand, the Court is faced with a Plaintiff who sat on its rights for almost two years before filing the instant lawsuit, while the City and the successful bidders went forward with the casino project, investing millions of dollars and dedicating important government resources. Despite its protestations to the contrary, BDC clearly had the option in 1997, or even in 1998, to follow the lead of *Lac Vieux* and *NewCentury* and immediately challenge the constitutionality of the preferences in both the Act and the Ordinance. Having signed a Consent and Release, "rolled-the-dice," and then lost in its bid to gain one of the coveted development agreements, BDC now asks the Court to shut down and restart the selection process on the eve of the opening of the temporary casinos. Furthermore, the Court is not blind to the irony of BDC now claiming First Amendment and equal protection violations, when BDC, in fact, supports casino gaming and promoted what was, in effect, a preference

for itself through its support of city ballot Proposal 1.

On the other hand, the Detroit Defendants are similarly in no position to claim either the moral or legal high ground. Although the Court expresses no opinion as to whether casino gaming will be the economic boon and panacea for the City that its supporters suggest, the Court finds it deeply troubling, and indeed somewhat reckless, that the City would risk the casino developments—a project showcased as one of the centerpieces of Detroit's rebirth—on an arguably unconstitutional Ordinance and selection process. The record clearly establishes that as early as 1997, the Detroit Defendants were placed on notice of potentially fatal constitutional defects in the selection process by the filing of the *Lac Vieux* and *NewCentury* cases.

Rather than taking prudent steps to immediately cure these potential constitutional deficiencies, the City made a conscious decision to plow ahead, first codifying the questionable preferences in law and subsequently proceeding with the selection and development process. In essence, the City also "rolled-the-dice," wagering that it would win in the courts. Having now suffered a serious setback with the Sixth Circuit's decision in *Lac Vieux,* the Court finds it somewhat disingenuous for the City to rely on the doctrine of laches when it had reason to know all along that a grave day of reckoning could well arrive.

In sum, there are no "good guys in white hats" in this high-stakes gamble by both sides involving a flawed process and participants who made conscious decisions to pay their money and take their chances. Thus, the Court is left to choose between two rather unappealing and unsatisfactory outcomes: (1) granting relief to a party that the Detroit Defendants somewhat aptly describe as a "disgruntled sore loser" who knew the rules of the game going in; or (2) impliedly sanctioning what may well amount to an unconstitutional selection process. With this background in mind, the Court turns its attention to BDC's

likelihood of success on the merits of its constitutional claims.

### 2. *BDC's Likelihood of Success on the Merits*

As noted above, BDC relies on the Sixth Circuit's recent holding in *Lac Vieux* subjecting the Ordinance to strict scrutiny to establish the requisite likelihood of success on the merits of its First Amendment, equal protection, and substantive due process challenges to the Ordinance. Faced with the daunting obstacle of satisfying the strict scrutiny standard, the Detroit Defendants concede the unconstitutionality of the Ordinance for the purposes of the instant Motion for Preliminary Injunction, arguing that the Court need not reach the substance of BDC's constitutional challenges in light of a series of threshold defenses: (1) the Consent and Release executed by Don Barden on behalf of BDC prior to entering the selection process; (2) the equitable doctrine of laches; and (3) BDC's alleged inability to establish injury-in-fact.

Although resolution of these issues, both independently and collectively, is an extremely close call, in the final analysis, the Court finds that the Consent and Release bars all of BDC's claims against the Detroit Defendants.

### 3. *The Consent and Release*

As indicated above, the Detroit Defendants assert that the plain language of the Consent and Release executed by Don Barden on behalf of BDC and various other Barden controlled entities on July 25, 1997, and then again on August 1, 1997, bars all claims against the City, the Mayor, the City Council, and the individual Council members. In making this argument, the Detroit Defendants cite paragraph 11 of the Consent and Release, which provides:

> **The Releasor,** and his, her or its heirs, executors, administrators, successors and assigns, **hereby release the City of Detroit** including all departments, agencies and commissions thereof, and their respective principals, agents, consultants, attorneys, advisors, employees, officers and directors (the "Releasees"), **and hold each of them harmless from any damages, claims, rights, liabilities, or causes of action, which the Releasor ever had, now has, may have or claim to have, in law or in equity, against any or all of the Releasees, arising out of or directly or indirectly related to the (i) RFP/Q process and the selection and evaluation of Proposals submitted in connection therewith;** (ii) release or disclosure of any Information whether intentional or unintentional; and (iii) use, investigation of, or processing of the Information.

[Joint Exhibit 36, emphasis added]. Specifically, the Detroit Defendants rely on paragraph 11(i), noting that BDC's constitutional claims against the Detroit Defendants arise out of, and are directly related to, the "RFP/Q process and the selection and evaluation of proposals submitted in connection therewith."

Despite the seemingly clear language of paragraph 11(i), BDC enumerates five primary arguments as to why the Consent and Release should not preclude the instant lawsuit against the Detroit Defendants:

1. The Consent and Release was meant to apply only to information-related claims;

2. The Ordinance only authorizes a release as to information related claims;

3. The unconstitutional condition doctrine precludes the Detroit Defendants from requiring a waiver of constitutional rights as a precondition to participating in the RFP/Q process;

4. Even if the Detroit Defendants could legally condition participating in the RFP/Q process on the signing of a release of claims, BDC did not voluntarily, knowingly, and intelli-

gently waive its right to bring constitutional challenges; and

5. The Consent and Release is void for lack of consideration.

As set forth in detail below, the Court finds each of BDC's arguments against application of the Consent and Release unavailing.

### a. *The Scope of the Consent and Release*

■ As its initial argument against application of the Consent and Release, BDC essentially posits that the Court should interpret the broad release language in paragraph 11(i) *in pari materia* with the other clauses of the Consent and Release, which deal almost exclusively with concerns emanating from potential liabilities for the disclosure and dissemination of information submitted by applicants in connection with their bid proposals. More specifically, BDC asserts that when read as a whole and in context, the Consent and Release acts only to bar claims relating to the gathering, use, processing, and disclosure of information provided by applicants or third parties as part of the RFP/Q process. In support of this argument, BDC relies on the fact that four of the five whereas clauses and nine of the twelve numbered paragraphs of the Consent and Release address informational concerns, and that the term "information" itself appears seventeen times in the document. In contrast, the language purportedly waiving all claims arising out of the RFP/Q process and the selection of developers does not appear until paragraph 11(i), where BDC asserts that it is "buried," without a separate heading, among two other subparagraphs which also deal with the use and dissemination of information. Finally, BDC argues that paragraph 12 underscores the informational nature of the Consent and Release by providing that "[t]he undersigned Releasor has read and understands this Consent and Release and hereby authorizes the direct and indirect collection of and consents to the use and disclosure of, the Information as described herein."

■ Under well-established law, courts construe releases consistent with general state law contract principles, with the intent of the parties controlling the scope of the release. *Taggart v. United States*, 880 F.2d 867, 870 (6th Cir.1989) (interpreting Michigan contract law); *Wyrembelski v. City of St. Clair Shores*, 218 Mich.App. 125, 127, 553 N.W.2d 651, 652 (1996); *Gortney v. Norfolk & Western Railway Company*, 216 Mich.App. 535, 540, 549 N.W.2d 612, 614 (1996). In determining the intent of the parties, the Court must look to the language of the release itself. "If the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument. However, if the scope of a release agreement is ambiguous, the question thus becomes one of determining the intention of the parties." *Taggart*, 880 F.2d at 870 (internal citations omitted). As neatly summarized by the Michigan Court of Appeals:

> If the text in the release is unambiguous, we must ascertain the parties' intentions from the plain, ordinary meaning of the language of the release. The fact that the parties dispute the meaning of a release does not, in itself, establish an ambiguity. A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation. If the terms of the release are unambiguous, contradictory inferences become subjective and irrelevant, and the legal effect of the language is a question of law.

*Gortney*, 216 Mich.App. at 540–541, 549 N.W.2d at 614–615 (internal citations and quotations omitted); *See also Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941) ("The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.").

Applying the aforementioned principles to the case at hand, the Court finds that the unambiguous language of the Consent and Release belies BDC's argument that the parties intended the document to release only information-related claims. While the Consent and Release as a whole is perhaps poorly structured with respect to the location of the release language, the clear and unequivocal text of paragraph 11 expressly addresses the type of claims that proposers were *releasing* by participating in the RFP/Q process. More specifically, in paragraph 11(i), BDC agreed to hold the Detroit Defendants harmless from any claims *in law or equity arising out of the* "RFP/Q process and the selection and evaluation of Proposals submitted in connection therewith."[27] The release of potential claims relating to the use and disclosure of information is then addressed in subparagraphs 11(ii) and 11(iii). Thus, paragraph 11 broadly precludes any claims or causes of action, whether in law or in equity, and then further delineates between the release of claims relating to information and the release of claims relating to the RFP/Q process and the selection and evaluation of proposals submitted in connection therewith.[28] Moreover, if the City only intended a release from liability as to information-related matters, subsection 11(i) would not have been necessary, as subsections 11(ii) and 11(iii) comprehensively release information-related matters. In light of this clear distinction, the Court finds BDC's argument that the Consent and Release applies only to information-related claims without merit.[29]

**b. *The Scope of the Authority Granted by the Ordinance***

Having found that the scope of the Consent and Release encompasses more than information-related claims, the Court turns to BDC's related argument that by requiring a blanket release of any and all claims, the Mayor exceeded the statutory authority granted by Ordinance § 18–13–4(b)(2), which provides:

(a) The mayor or his designee may require information and assurances from a prospective developer to demonstrate to the mayor's satisfaction that the prospective developer is eligible to enter into a development agreement with the city.

(b) *Without limiting the foregoing,* a prospective developer is not eligible to enter into a development agreement with the city if:

\*    \*    \*    \*    \*    \*

(2) It does not submit to the city a consent in the form required by the mayor or his designee, for itself and each of its officers, directors and owners, to allow the city to evaluate the personal and professional integrity and the professional capabilities of each individual or any other matters deemed relevant by the mayor or his designee.

**27.** BDC has also argued that the release encompasses only claims related to matters raised in the RFP/Q documents themselves. However, as the release language makes patently clear, the scope is much broader, including in its ambit claims arising out of the "RFP/Q process *and* the selection and evaluation of Proposals submitted in connection therewith."

**28.** BDC also unconvincingly argues that because the consent provisions all address informational concerns, if the City wished to distinguish a release of information-related claims from other types of claims, it should not have entitled the document in the conjunctive as a "Consent *and* Release," but rather in the disjunctive as a "Consent *or* Release." As noted above, however, subparagraphs 11(i) – 11(iii) make an unambiguous distinction between information-related claims, and other claims arising out of the RFP/Q process.

**29.** BDC also argues that by its own terms the Consent and Release does not apply to the Mayor and the City Council. Once again, this argument is belied by the clear language of paragraph 11 which broadly precludes all claims against "the City of Detroit including all departments, agencies and commissions thereof, and their respective principals, agents, consultants, attorneys, advisors, employees, officers and directors."

**Further, it shall submit to the city a release in the form required by the mayor or his designee which shall absolve the city, its agents, or employees from liability for seeking information about the prospective developer from third parties. Such release shall also absolve the third parties from liability for providing such information.**

Detroit City Code § 18–13–4(b)(2) (emphasis added). Relying on this section, BDC argues that the Ordinance only grants the Mayor authority to require a release as to information-related claims.

■ In analyzing this argument, the Court notes that public officials are presumed to have " 'properly discharged their official duties' " and, although this is a rebuttable presumption, the burden falls on the party asserting an ultra vires act to show otherwise. *Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.Ct. 1793, 1799, 138 L.Ed.2d 97 (1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996)); Jones, Rosen, Wegner, & Jones, *Rutter Group Practice Guide: Federal Civil Trials & Evidence*, ¶¶ 8:4925–8:4956, 8:4975–8:4980 (The Rutter Group 1999).

Applying this standard, BDC has failed to set forth sufficient evidence to rebut the presumption that the Mayor acted properly in requiring a release of all claims. While the Ordinance does require the Mayor to include language in a release pertaining to information-related claims, nothing in § 18–13–4(b)(2)—or anywhere else in the Ordinance for that matter—precludes the Mayor from also including broader language to protect the City from other types of claims. Quite the contrary, § 18–13–4(b)(2) on its face expressly authorizes the Mayor to draft a release in the form he deems proper.

Moreover, BDC's construction of § 18–13–4(b)(2) ignores the fact that § 18–13–4(a) grants the Mayor broad discretion to require "information and assurances from a prospective developer to demonstrate to the Mayor's satisfaction that the prospective developer is eligible to enter into a development agreement with the city." [30] Given this broad discretion, the Court finds that the Mayor did not exceed his statutory authority by requiring a release as to any claims, whether in law or in equity.

**C.** *The Unconstitutional Condition Doctrine*

■ BDC next argues that the unconstitutional condition doctrine precludes application of the Consent and Release to constitutional claims. The unconstitutional condition doctrine grows out of the principle that in certain circumstances, the government may not deny a benefit to an individual on a basis that infringes constitutionally protected interests, particularly the right to free expression. The Supreme Court explained the policy rationale underlying the doctrine as follows:

For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

---

**30.** As noted above, § 18–13–4(b) provides that nothing in that subsection should limit the discretion afforded the Mayor in § 18–13–4(a).

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

The leading case in the Sixth Circuit applying the unconstitutional condition doctrine is *G & V Lounge, Inc. v. Michigan Liquor Control Commission,* 23 F.3d 1071, 1077 (6th Cir.1994), where the Court struck down an attempt by the City of Inkster to condition the granting of a liquor license/entertainment permit on G & V's agreement not to offer adult entertainment at its facility. In reaching this decision, the Sixth Circuit set forth a clear rule that "a state actor cannot constitutionally condition the receipt of a benefit ... on an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression." (citing *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697–98 and *Keyishian v. Board of Regents,* 385 U.S. 589, 606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967)).

Arguing by analogy to *G & V,* BDC asserts that the Detroit Defendants impermissibly conditioned a benefit—participation in the RFP/Q process—on a developer's agreement to sign away its constitutional rights through the Consent and Release. In response, the Detroit Defendants argue that the instant case is governed by a separate and distinct line of cases holding that an individual may release the right to bring constitutional challenges so long as such release is entered into voluntarily and is not the product of misconduct on the part of the City. *See Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987); *Burke v. Johnson,* 167 F.3d 276 (1999); *Cf. Salmeron v. United States,* 724 F.2d 1357, 1361(9th Cir.1983) ("A release of claims for violations of civil and constitutional rights must be voluntary, deliberate and informed"). More specifically, the Detroit Defendants contend that as an experienced, sophisticated, and successful businessman, familiar with releases and represented by well-respected and highly competent counsel throughout the RFP/Q process, Mr. Barden made a conscious and informed decision to sign the Consent and Release and move forward with the RFP/Q process.

Because the Court finds that the applicability of the unconstitutional condition doctrine to the case at hand presents a close question of law, the Court will explore both the unconstitutional condition and *Rumery* line of cases in some detail.

In *Perry,* a non-tenured junior college professor, who had vocally criticized policies of the college's Board of Regents, brought suit alleging, *inter alia,* that the Board's decision not to renew his employment contract was based on public criticism of the school's policies and, thus, infringed his right to freedom of speech. The district court granted summary judgment for the defendants on the grounds that the professor had no contract right to employment. On appeal, the Fifth Circuit reversed, finding that "despite the respondent's lack of tenure, the nonrenewal of his contract would violate the Fourteenth Amendment if it in fact was based on protected free speech."[31] *Perry,* 408 U.S. at 596, 92 S.Ct. at 2697. Relying on the unconstitutional condition doctrine, the Supreme Court affirmed the Fifth Circuit's decision, noting that "the respondent's lack of a contractual or tenure 'right' to reemployment for the 1969–1970 academic year is immaterial to his free speech claim." *Id.*

As noted above, *G & V* involved a dispute over whether the City of Inkster could condition approval of a liquor license and entertainment permit on G & V's agreement not to offer topless dancing at one of its establishments in Inkster, the Mustang Lounge. In 1979, a previous operator of the Mustang Lounge, Soco Enterprises, Inc. ("Soco"), entered into an agreement with Inkster whereby the city

---

**31.** The Fifth Circuit found that factual questions existed as to the actual reason for the Regent's decision, and remanded the case to the District Court for further proceedings. *Perry,* 408 U.S. at 596, 92 S.Ct. at 2697.

would approve Soco's request for a liquor license/entertainment permit in return for Soco's assurances that it would not permit topless dancing on the premises.[32]  Soco operated the lounge until 1983, when ownership of the license/permit was transferred to G & V.

Thereafter, G & V provided entertainment in the form of live bands and dancing at the lounge until September 24, 1992, when it informed the city that it intended to offer topless dancing.  The city responded by enacting an ordinance authorizing the city council to recommend non-renewal or revocation of a liquor license/entertainment permit in the event the nature of the entertainment offered by a licensee changes or the licensee fails to comply with any general or specific condition imposed pursuant to the granting of the license.

Relying on the newly enacted ordinance, the Inkster city attorney informed G & V that if it violated the terms of the 1979 agreement by offering topless dancing, the lounge risked losing its license/permit. Shortly thereafter—and prior to offering adult entertainment at the lounge—G & V sought a temporary restraining order and preliminary injunction in federal district court, alleging, *inter alia,* that the conditional restriction on adult entertainment violated the First Amendment.  Following a hearing, the district court dismissed the case finding that there was no present case or controversy between the parties because Plaintiff had not yet offered topless dancing, and that as a successor to Soco's 1979 agreement, G & V had waived its First Amendment rights.  *G & V,* 23 F.3d at 1074, 1077.

On appeal, the Sixth Circuit reversed, holding that G & V had suffered sufficient injury to establish standing and that the 1979 agreement violated the unconstitutional condition doctrine.  In reaching this

decision, the Sixth Circuit flatly rejected the district court's finding that G & V had waived its First Amendment rights as the successor to the 1979 agreement, reasoning that "the city's 1979 contract with Soco Enterprises, Inc. constituted an attempt to condition Plaintiff's receipt of a benefit upon Plaintiff's waiver of its right to free expression, contrary to the principles set forth in *Perry* and *Keyishan.*  As such, the contract is unenforceable."  *Id.* at 1077.

As indicated above, however, the unconstitutional condition cases appear at least to some extent to conflict with *Rumery* and its progeny, which suggest that in some instances a state actor may condition the receipt of a benefit on a party's agreement to release all claims.  *Rumery* arose when Bernard Rumery, an acquaintance of both the alleged perpetrator and the alleged victim in a sexual assault case, contacted the victim to inquire into the details of the case.  Following the conversation, the victim informed the police that Rumery was trying to get her to drop the charges.  Based on this information, the police arrested Rumery on state witness tampering charges.  After Rumery's attorney threatened to sue if the charges were not dropped, the parties signed a written agreement whereby the prosecuting attorney agreed to dismiss the charges in return for Rumery's promise to release any claims he might have against the town, its officials, or the victim.  Nonetheless, ten months later Rumery filed a § 1983 action in Federal District Court for the District of New Hampshire, alleging that the town and its officers violated his constitutional rights by falsely arresting, falsely imprisoning, and defaming him.

Relying on the release-dismissal agreement, the defendants filed a motion to dismiss, which Rumery opposed on the grounds that such agreements are unenforceable as violative of public policy.  The

---

**32.**  It is not possible to discern from the text of the *G & V* decision whether the agreement also included a release of claims, or whether the Sixth Circuit had occasion to address this rather important aspect of that case.  Accordingly, the Court assumes this question was simply not presented to the courts in *G & V.*

district court rejected Rumery's argument, finding that a "release of claims under section 1983 is valid . . . if it results from a decision that is voluntary, deliberate and informed." *Rumery*, 480 U.S. at 391, 107 S.Ct. at 1191. On appeal, the First Circuit reversed, adopting a per se rule invalidating release-dismissal agreements. *Id.*

After granting certiorari, the Supreme Court rejected the First Circuit's per se rule, finding that while "in some cases these agreements may infringe important interests of the criminal defendant and of society as a whole, we do not believe that the mere possibility of harm to these interests calls for a per se rule." *Id.* at 392, 107 S.Ct. at 1192. The Supreme Court went on to enforce the release/dismissal agreement, holding that lower courts should evaluate agreements on a case by case basis to determine: (1) whether the agreement was voluntary; (2) whether the agreement was the product of misconduct; and (3) whether the enforcement of the agreement would adversely affect the relevant public interest. *Id.* at 398, 107 S.Ct. at 1195.

The Sixth Circuit elaborated on *Rumery* in *Burke v. Johnson*, 167 F.3d 276 (6th Cir.1999), addressing the question of the standard of proof necessary to establish the *Rumery* voluntariness factor. Like *Rumery*, *Burke* involved the viability of an agreement whereby an arrestee, Burke, released all claims against a township, the township police department, and various officers in return for the State dismissing a felonious assault of a police officer charge.[33] The release was never reduced to writing, but was read into the record as part of an oral plea agreement ultimately accepted by the trial judge. As part of the plea colloquy, the trial judge enumerated the constitutional rights that Burke was relinquishing by pleading guilty, but the judge did not enumerate the specific claims that the defendant was foregoing by entering into the release-dismissal agreement.[34] Six months after the plea, Burke filed a § 1983 action, which the District Court dismissed with prejudice on the basis of the release.

On appeal, the Sixth Circuit first addressed the question of the standard of proof necessary to establish the *Rumery* voluntariness factor, finding that a preponderance of the evidence standard applies. In reaching this decision, the panel declined to follow the Third Circuit's application of a "clear and convincing evidence" standard to an oral release agreement in *Livingstone v. North Belle Vernon Borough*, 91 F.3d 515 (3rd Cir.1996):

> We decline to adopt the Third Circuit's 'clear and convincing evidence' standard for several reasons. First, we find that reading the release/dismissal agreement into the record in the context of a plea hearing as was done in this case, should be viewed as the equivalent of a written agreement since judicial supervision provides due process protection against prosecutorial overreaching and insures voluntariness under all but the most unusual circumstances. Therefore, a release under these circumstances should be governed by the same 'preponder-

**33.** The release-dismissal agreement provided: [T]he defendant [Burke], his heirs, and assigns warrant . . . that he will release now and forever any of the officers associated with the circumstances surrounding this matter, and specifically, Jackson Township Police Department, Chief Johnson, Officer Quigley, Officer West, Detective Vaughn, Montgomery County, the County Commissioners, the Trustees of Jackson Township, and anyone else, so that this is a complete resolution of all matters between the parties in consideration of the State giving up the important count of felonious assault of a police officer, which is an aggravated felony of the first degree, along with the specification thereto.

*Burke*, 167 F.3d at 278.

**34.** As part of the plea colloquy, Burke expressly acknowledged that he understood and approved the terms of the plea agreement, which directly beforehand was read into the record by the prosecutor and stipulated to by defense counsel.

ance of the evidence' standard applicable in ordinary civil contract actions.

\* \* \* \* \* \*

More importantly, we are persuaded that a simple 'preponderance of evidence' standard of proof is sufficient for determining whether an on-the-record oral agreement relinquishing the right to pursue a civil action was voluntarily made in light of the fact that this lesser standard applies in determining the voluntariness of a criminal defendant's waiver of his constitutional rights. If a preponderance of evidence standard applies when determining if there is a voluntary waiver of a criminal defendant's constitutional rights, we see no reason for application of an elevated standard where lesser rights are implicated.

*Burke*, 167 F.3d at 284–285 (internal citations omitted). The Court then affirmed the District Court's dismissal of Burke's § 1983 action, finding that the release was enforceable under the *Rumery* factors. *Id.* at 285–286.

Having carefully analyzed and considered both lines of cases, the Court finds the instant case involving a Consent and Release more analogous to the *Rumery* line of cases than to the *Perry* or *G & V* family of cases. More specifically, the policies underlying the unconstitutional condition doctrine—that state actors should not deny benefits in retaliation for an individual's exercise of constitutional rights or directly condition the granting of a benefit on an individual forfeiting the right to engage in protected expression—are not implicated in this case. Unlike *Perry*, where the state actor was alleged to have denied a benefit in direct retaliation for an individual's exercise of free speech, the record in the instant case contains no evidence whatsoever that the Detroit Defen-

dants imposed the Consent and Release requirement in retaliation for BDC asserting its First Amendment rights, or any other constitutional rights for that matter.

Moreover, in contrast to *G & V*, where the state actor directly conditioned the receipt of a benefit on an agreement to prospectively refrain from engaging in protected expression, the Detroit Defendants in the instant case only conditioned the consideration of BDC's gaming proposal on an agreement to release all claims. Thus, BDC was not required to directly forfeit its First Amendment rights by signing the Consent and Release, but rather released the right to bring suit and challenge the selection process. Viewed in the context of a release of claims, rather than a direct restriction on freedom of expression, the instant case squarely falls within the ambit of *Rumery* and the well-established principle that individuals are free to release constitutional rights so long as the decision is reached voluntarily, knowingly, and intelligently and is not the product of misconduct.[35]

### d. *The Rumery Factors*

Applying the *Rumery* factors to the instant case, the Court finds no grounds for invalidating the Consent and Release. With respect to voluntariness, BDC asserts that in contrast to *Rumery*, where the parties engaged in negotiations to arrive at a mutually beneficial agreement, the Detroit Defendants presented prospective developers with a purportedly involuntary "take it or leave it" choice: either sign the Consent and Release or forfeit the chance to participate in the RFP/Q process. While the Court agrees that developers were required to sign the Consent and Release as a prerequisite to participat-

---

**35.** BDC also cites paragraph 10 of the Consent and Release—which provides that "[t]he City of Detroit is controlled by certain statutes of the United States and State of Michigan and divisions thereof"—for the proposition that the Consent and Release expressly obligates the Detroit Defendants to act constitu-

tionally. BDC fails to recognize, however, that one of the laws of the United States, as set forth in detail above, is that an individual may release the right to bring constitutional claims so long as the decision is reached voluntarily, knowingly, and intelligently and is not the product of misconduct.

ing in the RFP/Q process, this choice did not leave BDC without options. More specifically, as opposed to signing the Consent and Release and moving forward with the RFP/Q process, BDC could have immediately brought an action challenging the constitutionality of the preferences.[36] Alternatively, BDC could have signed the release with reservation and then brought suit if the City refused to accept its proposal. Rather than electing one of these alternative courses of action, however, BDC made a conscious decision, after having more than one month to review RFP I with the assistance of competent counsel, to sign the Consent and Release and move forward with the RFP/Q process.

In finding that BDC voluntarily executed the Consent and Release, the Court recognizes the difficult choice with which BDC was presented in the Summer of 1997: either immediately file suit against the Detroit Defendants, or sign the Consent and Release and enter into the RFP/Q process. However, as noted by the Supreme Court, the legal system frequently requires parties to make difficult decisions:

> The criminal process, *like the rest of the legal system,* is replete with situations requiring the making of difficult judgments as to which course to follow. **Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.**

*Rumery,* 480 U.S. at 393–394, 107 S.Ct. at 1192 (citations and quotations omitted) (emphasis added). Thus, the fact that

BDC was required to elect between suing now or taking its chances in the selection process, does not by implication mean that BDC signed the Consent and Release involuntarily.

Furthermore, the record supports the conclusion that BDC either knew or should have known that the Consent and Release applied to constitutional claims. First and foremost, although the document itself does not expressly state that constitutional claims are being released, the clear language of the Consent and Release speaks to any claims whether in law or equity. Contrary to BDC's assertions, it does not require a leap of logic or fancy footwork to conclude that the phrase "any claims in law or equity" encompasses constitutional challenges. Stated another way, "any claims" means "any claims." Moreover, Mr. Barden is a very experienced, sophisticated, and successful businessman, who was represented by well-respected and competent counsel throughout the RFP/Q process. Both he and his lawyers had more than one month after RFP I was published on June 23, 1997 to pour over the language of the Consent and Release with a fine tooth comb. Finally, the record evidence reveals that Mr. Barden was experienced in bidding on government contracts and licenses which required him and his affiliates to release any claims they might have against the governmental authority. In point of fact, Mr. Barden testified at the June 28, 1999 hearing that he was familiar with the term "release," and that he had signed a release of all claims as part of his successful gaming bid in Indiana.[37] [Hearing Transcript, p. 184].

**36.** Presumably this is the decision that Lac Vieux made when confronted with this Hobson's choice. Rather than electing to sign the Consent and Release and gamble on going forward, Lac Vieux opted to immediately challenge the Act and the Ordinance. BDC elected the other avenue.

**37.** Upon questioning from the Court at the June 28, 1999 hearing, Mr. Barden at first could not recall signing a similar release as

part of his Indiana proposal, but then corrected his testimony after being show a copy of a Release from the Indiana Gaming Commission by defense counsel, which provides:

RELEASE OF ALL CLAIMS
The undersigned has filed with the Indiana Gaming Commission ("Commission") certain forms and documents in connection with a written request for licensing by the Commission ("Application"). In consideration of the assurance by the Commission

At a minimum, even if the Court were to accept BDC's argument that the plain language of paragraph 11(i) did not place all prospective developers on notice that the Consent and Release applied to much more than information-related claims, events during the consideration process should have made the broad nature of the release abundantly clear. In the question and answer phase of the RFP/Q process, at least one developer submitted a question to the City directly relating to the scope of the Consent and Release. After first citing Ordinance § 18–13–4(b)(2), this question reads:

> **The consent and release attached as Appendix D to the Request for Proposals/Qualifications is significantly broader than the requirements set forth by the City Council** and requires a release of rights which a proposer may have with respect to property interests.
>
> Will the Proposer be automatically disqualified for its failure to execute the Consent and Release in the form submitted as Appendix D, but provides the inquiry consents and releases required by City Council Ordinance.

[Exhibit Book to Plaintiff's Reply Brief, Tab 7, emphasis added].

On July 21, 1997, Phyllis James, City of Detroit Corporation Counsel, sent a response to all prospective RFP respondents (including BDC), which provides:

> that no vote on said Application will be taken except after a deliberate, intensive, and thorough investigation of the undersigned, including but not limited to background, associates, and finances, the undersigned does for myself, my heirs, executors, administrators, successors and assigns, hereby release, remise, and forever discharge the State of Indiana, the Commission, its members, agents, and employees, from any and all manner of actions, causes of actions, suits, debts, judgments, executions, claims and demands whatsoever, known or unknown, in law or equity, which the undersigned ever had, now has, may have, or claim to have against any or all of said entities or individuals arising out of or by reason of the processing or investigation

Section 18–13–4(b)(2) of the Casino Development Competitive Selection Process ordinance allows the Mayor or his designee to prescribe the form of Consent and Release as a condition to entering into a development agreement with the City. A Proposer may be disqualified from the RFP/Q process by failing to adhere to any aspect of the RFP/Q. [Exhibit Book to Plaintiff's Reply Brief, Tab 7]. Thus, as early as July 21, 1997, all prospective developers were placed on notice that the Consent and Release encompassed much more than information-related claims.[38]

In sum, the record clearly establishes by a preponderance of the evidence that BDC voluntarily and intelligently signed a Consent and Release that it knew, or should have known, released all claims, including constitutional claims, against the Detroit Defendants arising out the "RFP/Q process and the selection and evaluation of Proposals submitted in connection therewith."

With respect to the second *Rumery* factor, evidence of misconduct, the Court finds that the record is devoid of any evidence suggesting improper conduct on the part of the Detroit Defendants. Although, as the Court has noted, the Consent and Release is certainly not structured in an ideal fashion, and one would hope that the general and broad nature of the release would have been more prominently featured in the body of the docu-

> of or other action relating to the Application.
>
> [Hearing Transcript, pp. 184–185; Hearing Exhibit 4].

38. The record does not specify which prospective developer submitted the question relating to the scope of the release. As noted above, however, the City sent the question and the answer to all prospective casino respondents, and it is undisputed that BDC received both the question and the answer. In point of fact, BDC submitted a copy of the question and the answer as part of the Exhibit Book to its Reply Brief to Response of Detroit Defendants.

ment so as to call attention to the City's intended release of all claims, the bottom-line inquiry remains the same: Did BDC know, or should it have known, that it was releasing all claims, or did misconduct by any city official or employee deprive BDC of its ability to make a knowing and voluntary release? The Court has already answered the first part of this inquiry: BDC clearly knew or should have known that it was releasing all claims. As to the second part of this inquiry, whether there was any misconduct or deceit by the City intending to mislead BDC and other applicants, the Court finds there is simply no evidence to support this beyond speculative inference from the structure of the Consent and Release itself. More specifically, the full record contains absolutely no evidence whatsoever of any statements, documents, or other correspondence, suggesting that the Detroit Defendants purposefully buried the relevant Consent and Release language in paragraph 11(i), or purposefully attempted to mislead any of the prospective developers as to the rights they were foregoing by signing the Consent and Release. Indeed, Phyllis James unequivocally testified at the June 28, 1999 hearing that there was no intent to hide the relevant release language:

THE COURT: Was there any intent to hide the release provision, the general release provision, in the rest of the provisions?

MS. JAMES: No. The intent of the release actually is as it's stated in the document on the face of it; it was to protect the City from a plethora of legal claims arising out of the RFP proposal, review and selection process, so that the process was not barred down for years in litigation with the anticipated benefits from the City of Detroit from having gaming.

Secondly, we wanted to make sure that there were no issues involved in the distribution of information that might have to be distributed as a result of the RFP process. We were aware of the Ordinance that the local competitive selection process ordinance that had certain provisions in it pertaining to the release. But the Ordinance was somewhat limited in its view of a release and it was our design to have a much broader release and legal effect.

[Hearing Transcript, pp. 252–253]. In addition, Mr. Barden conceded at the hearing that no one from the City misled him regarding the scope of the release. [Hearing Transcript, p. 179]. Accordingly, the Court determines that the second *Rumery* factor is satisfied.

Turning to the final *Rumery* factor, the Court finds that the Detroit Defendants had legitimate and important public policy reasons for requiring a Consent and Release as to all claims that clearly outweigh any relevant adverse public interests. In light of the substantial cost of even participating in the RFP/Q process, and the potential for enormous profits if selected as one of the casino developers—a reward which may stretch into the hundreds of millions of dollars—it was highly likely, if not certain, at the time the City Council promulgated the Ordinance and the City published RFP I, that the RFP/Q process would result in litigation by spurned developers. Given this high probability of litigation and the potential exposure of the City's taxpayers, who would ultimately bear the responsibility of financing any adverse judgment, it was perfectly reasonable for the Detroit Defendants to require a broad release of all claims. In fact, it would have been irresponsible not to require a release.

Moreover, through various ballot proposals, the citizens of the City of Detroit a the State of Michigan have resoundingly expressed their desire for casinos in Detroit. Given the clear public sentiment in favor of casino gaming, the City was entitled to take steps to insure that the process did not become bogged down in the courts in perpetuity. In addition, as explained in detail above, the Consent and Release did not leave BDC without op-

tions. BDC reached a fork in the road in 1997, and rather than immediately challenging the Ordinance, elected to sign the Consent and Release and move forward with the RFP/Q process.

Finally, the Court believes that, absent compelling reasons, courts should not second-guess the policy branches of the government on questions involving what is required to protect the interests of the citizenry. As a general matter, in a democratic system, it is best to leave such questions to the democratically elected representatives of the people, rather than for courts to impose their own view of what is, or is not, in the public interest.

### e. *Consideration*

Having found that the Consent and Release satisfies the *Rumery* factors, the Court turns to BDC's final argument that even if the Court finds a voluntary, knowing, and intelligent release of constitutional claims, the Consent and Release is void for lack of consideration. More specifically, BDC argues that the City was already obligated to accept BDC's proposal prior to the execution of the Consent and Release, and that the performance of an existing legal obligation does not constitute adequate consideration.

Under Michigan law, as a general rule, courts will not inquire into the adequacy of consideration. *Cochran v. Ernst & Young*, 758 F.Supp. 1548, 1555 (E.D.Mich.1991); *Cleveland–Cliffs Iron Co. v. Chicago & North Western Transp. Co.*, 581 F.Supp. 1144, 1150 (E.D.Mich. 1984); *Moffit v. Sederlund*, 145 Mich.App. 1, 378 N.W.2d 491, 497 (1985). It is only when the record establishes that the consideration given was "so grossly inadequate as to shock the conscience" that courts will intervene. *Cleveland–Cliffs Iron, supra; Hake v. Youngs*, 254 Mich. 545, 236 N.W. 858 (1931).

Applying these straightforward legal standards, the Court finds BDC's consideration argument without merit.

BDC's assertion that the City was already legally obligated to consider its proposal prior to signing the Consent and Release is simply not correct. In point of fact, the City did not become obligated to review any proposals until the applicant had complied with all of the requirements for submitting a proposal, which included the execution of the Consent and Release. Moreover, BDC did in fact receive valuable consideration for signing the Consent and Release. In return for releasing all claims, BDC gained the right to have its casino proposal reviewed by the City, an opportunity potentially worth hundreds of millions of dollars. Finally the Court notes that BDC expressly acknowledged the adequacy of consideration in the Consent and Release itself, which provides, "[T]he Releasor, in consideration of the City of Detroit's accepting for review a Proposal in which Releasor has an economic interest and other valuable consideration the sufficiency of which is hereby acknowledged, agrees as follows."

In sum, the record demonstrates that a highly sophisticated business entity, represented by well-respected and competent counsel, made a rational and informed decision, after being put on notice as to the potential breadth and scope of the claims barred by the Consent and Release and being provided several weeks to parse through the language of the document, to sign an agreement releasing the Detroit Defendants from "any damages, claims, rights, liabilities, or causes of action, which the Releasor ever had, now has, may have, or claim to have, in law or equity." In return for signing this agreement, BDC gained the right to participate in the RFP/Q process and potentially gain a portion of what may become the highly lucrative casino business in Detroit. Having "rolled-the-dice" and lost, BDC cannot now escape the plain language of the Consent and Release and welch on its bet. Accordingly, for all of the aforementioned reasons, the Court finds as a matter of law that the Consent and Release bars all of

BDC's claims, including the constitutional claims, against the Detroit Defendants.

## C. BDC's Claims Against the State Defendants

Having found that the Consent and Release precludes all claims against the Detroit Defendants, the Court next addresses the merits of BDC's facial and as applied challenges to the Act. As its initial argument, BDC asserts that M.C.L.A. § 432.206(3) impugns First Amendment, equal protection, and substantive due process rights by granting a tie-breaking preference to developers that championed the drive to bring casino gaming to Detroit. For the following reasons, however, the Court finds that BDC lacks standing to bring constitutional challenges predicated on the § 432.206(3) tie-breaking preference.

Under well-established constitutional law, BDC must have standing to assert constitutional challenges to the Act. As cogently explained by the Sixth Circuit, "'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.'" *Lac Vieux,* 172 F.3d at 403 (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Setting aside prudential concerns, constitutional limitations on standing dictate that a claim present an actual case or controversy, which according to the Supreme Court involves three basic elements:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury

and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted).

Returning to the present case, BDC cannot establish an injury resulting from the § 432.206(3) tie-breaking preference because such preference was rendered inoperative by the 1997 amendments to the Act. More specifically, § 432.206(3) provides:

> In the event that more than three (3) applicants meet the standards for eligibility and suitability provided for in subsections (4) and (5), licenses shall first be issued to those eligible and suitable applicants which submitted any casino gaming proposal for voter approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal.

M.C.L.A. § 432.206(3).

While a first glance this section appears to support BDC's claims, a close reading of the Act reveals that § 432.206(2) renders the tie-breaking preference a nullity by mandating that "[a] city shall not certify or submit and have pending before the board more than 3 certified development agreements." M.C.L.A. § 432.206(2). By limiting a city to submitting three certified development agreements at a time, the Act insures that the Board will never have occasion to apply the § 432.206(3) tie-breaking preference, which *only* comes into play if the Board has before it "more than three (3) applicants." With the preference effectively inoperative, the State Defendants correctly argue that BDC cannot identify any injury proximately related to the tie-breaking preference, an element necessary to establish standing.

The Court's interpretation of the statutory language is buttressed by the findings of at least two other federal courts, includ-

ing binding precedent from the Sixth Circuit, which have each found the § 432.206(3) tie-breaking preference effectively a nullity. More specifically, in *Lac Vieux*, the Sixth Circuit explained:

> [T]he amended act appears to render the preference ineffective. If the preference is ineffective, then there can be no injury and no "case or controversy." Although *Lac Vieux* attempts to rebut the defendants' and the intervenors' contention that the preference is ineffective, we find its argument neither fully developed nor convincing. We therefore hold that because the preference in the amended act is ineffective, Lac Vieux does not have standing to bring an equal protection challenge to the amended act.

*Lac Vieux*, 172 F.3d at 406.[39]

Likewise, when given the opportunity to interpret the same language in *NewCentury*, Judge Edmunds reasoned:

> Section 432.206(3) contains the allegedly preferential language of which Plaintiffs complain, it requires the Board to issue licenses first to those who submitted a casino gaming proposal for voter approval, *if more than three applicants meet the standards for eligibility*. Yet, section 432.206(2) does not allow a city to submit more than three development agreements at one time. (Section 432.206(1)(b) requires the license applicant to have entered into a certified development agreement with the city where the casino will be located.) Thus, according to the statutory language, the Board will not be considering more than three applicants at a time. The state preference, as the State Attorney General points out "is effectively inoperative and immaterial."

Order Granting Defendants' Motions for Summary Judgment, June 3, 1998, pp. 12–13, (emphasis in original). Accordingly, the Court finds that BDC lacks standing to assert constitutional challenges to the Act predicated on the § 432.206(3) tie-breaking preference.

Despite this seemingly impenetrable obstacle to relief, BDC asserts the following two additional theories: (1) that the Act is unconstitutional on its face because the statute expressly incorporates the City's illegal Ordinance preferences; and (2) even if facially valid, the Act is unconstitutional as applied because by proceeding with the licensing process, the State Defendants have ratified unconstitutional actions taken by the Detroit Defendants. For the following reasons, the Court finds both of these novel theories without merit.

In making its first argument, BDC essentially asks the Court to view the Act and the Ordinance as one seamless body of law, joined together by § 432.206(1)(b), which provides in pertinent part:

> A person is eligible to apply for a casino license if all of the following criteria are met ... The applicant entered into a certified development agreement with the city where the local legislative body enacted an ordinance approving casino gaming.

M.C.L.A. § 432.206(1)(b). Thus, without citing any relevant supporting law, BDC argues that by requiring prospective licensees to submit certified development agreements as part of the license application process, the Act incorporates the Detroit Ordinance governing the selection of developers with whom the City intends to negotiate development agreements.

While this is a creative argument, the statutory language simply does not support BDC's incorporation theory. By its express terms, the Act governs only the state licensing and continuing regulation of casino operators, leaving to the City of Detroit the responsibility for selecting those developers with whom it wished to enter into development agreements. The Act does not directly incorporate the Ordinance or for that matter enumerate any

---

**39.** As noted above, the Sixth Circuit applied the same standing analysis to Lac Vieux's First Amendment challenge to the Act. *Lac Vieux*, 172 F.3d at 408.

criteria governing the City's selection of developers. Indeed, the Act contains no language whatsoever even suggesting that the Detroit City Council was required to enact an ordinance governing the selection of those developers with whom the City wished to negotiate development agreements.[40] In sum, it was the Detroit City Council that adopted the Ordinance containing the arguably unconstitutional preferences, and the Mayor that selected Atwater, Greektown, and MGM pursuant to the RFP/Q process. Given this clear delineation of authority between the Act and the Ordinance, BDC cannot bootstrap the Ordinance preferences into the Act, particularly when the State took measures to cure any potential constitutional infirmities in its Act through the 1997 amendments to the statute as originally enacted. *See Hartford Fire Insurance Co. v. Lawrence, Dykes, Goodenberger, Bower, & Clancy,* 740 F.2d 1362, 1366 (6th Cir.1984) ("state legislatures are presumed by federal courts to have acted constitutionally in making laws.") (citing *McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969)).

As its third and final argument, BDC contends that even if the Court finds the Act facially valid, the State Defendants have unconstitutionally applied the statute by ratifying the Detroit Defendants' illegal selection process. More specifically, BDC asserts that having delegated authority to the City to select developers, the State Defendants cannot blithely sit back and enforce the preferential treatment mandated by the Ordinance by proceeding with

the licensing process for Atwater, Greektown, and MGM.

▄▄▄ In asserting its as applied challenge, however, BDC fails to recognize that under well-established law, local ordinances—like state statutes—are entitled to a strong presumption of constitutionality.

> With regard to the presumption of constitutionality, the rule applicable to ordinances of a city government is the same as that applied to statutes passed by the legislature. A statute will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation.

*Cady v. City of Detroit,* 289 Mich. 499, 505, 286 N.W. 805, 807 (1939).

▄▄▄ Given this presumption of constitutionality, the Board was perfectly justified to proceed with the licensing process, particularly in light of the fact that no court has, as yet, declared the Ordinance unconstitutional. Although the Sixth Circuit did reverse and remand Lac Vieux's First Amendment and equal protection challenges to the Ordinance on April 12, 1999, these claims remain pending and unresolved in the United States District Court for the Western District of Michigan. Thus, at the present time, the State Defendants correctly argue that the Board was justified in presuming the constitutionality of the Ordinance and proceeding with the investigation of the selected developers' license applications.[41]

> *Lac Vieux,* however, the Detroit Defendants retain the right on remand to attempt to satisfy the strict scrutiny standard. Further, unlike the Detroit Defendants who enacted the Ordinance and bear the responsibility for insuring its constitutionality in the first instance—and were placed on notice early on about potential constitutional defects in the Ordinance—the State Defendants are under a legal obligation to presume the Ordinance's constitutionality and to proceed with its licensing responsibilities.

---

**40.** Indeed, under the terms of the Act, the executive branch of the City could have simply issued a RFP, a course of action that, with the benefit of hindsight, the City Council may well wish it had acquiesced in rather than adopting the Ordinance containing the preferences.

**41.** The situation would be far different if the State Defendants had proceeded with the licensing process after a federal court had flatly declared the Ordinance unconstitutional. In

Finally, even assuming that the Board had reason to believe that the Ordinance was unconstitutional, BDC cites no legal authority whatsoever that purports to endow the Board with the power to declare a local Ordinance unconstitutional. To the contrary, the Board is under an express statutory obligation to review all license applicants that satisfy the selection criteria set forth in the Act.

> The board *shall* issue a casino license to a person who applies for a license, who pays the nonrefundable application fee required under section 5(5) and a $25,000 license fee for the first year of obligation, and who the board determines is eligible and suitable to receive a casino license under this act and the rules promulgated by the board.

M.C.L.A. § 432.206(1). Given this mandate, it would have likely been a violation of the law for the Board not to proceed with the investigation of Atwater, Greektown, and MGM's license applications.[42] Accordingly, the Court finds BDC's as applied challenge to the Act unavailing.

### D. The Defendants' Motions for Summary Judgment

As indicated above, the Detroit and the State Defendants filed separate motions for summary judgment on June 15, 1999 and June 22, 1999, respectively. Because the Court has found, for the reasons set forth above, that the Consent and Release bars all claims as matter of law, the Court finds that the Detroit Defendants are entitled to summary judgment as to all of BDC's claims.[43] Likewise, because BDC has failed to assert a valid challenge to the Act, the State Defendants are also entitled to summary judgment as a matter of law.

## IV. CONCLUSION

For all of the aforementioned reasons:

IT IS HEREBY ORDERED that BDC's Motion for Preliminary Injunction is DENIED.

IT IS FURTHER ORDERED that the Detroit Defendants' Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that the State Defendants' Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that this case be dismissed, in its entirety, with prejudice.

---

42. At the June 28, 1999 hearing, Nelson Westrin confirmed that the Board does not have discretionary authority to consider the propriety of the City's selection process:

THE COURT: Let me ask you this. Does the Gaming Board consider issues outside of the qualifications of the particular people involved in the Development Agreement? By that I mean, for example, there is, obviously, the pending lawsuit here. It is the Sixth Circuit decision in the Lac Vieux case, which has called into question the statute, the selection process the City of Detroit used. Is that something that the Gaming Board considers in making determinations as to whether or not to issue a license?

THE WITNESS: No. We're required to administer, implement, and enforce the law as written. We don't consider those types of things outside the background investigation.

THE COURT: So with respect to that yours is a nondiscretionary function?

THE WITNESS: Correct.

[Hearing Transcript, p. 233].

43. Although the June 28, 1999 hearing focused on evidentiary and legal issues surrounding the federal constitutional claims in Counts I – VI of BDC's Complaint, and the applicability of the Consent and Release to those claims, it is clear for the reasons set forth above that the Consent and Release operates to bar all of BDC's claims.