RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0374P (6th Cir.)
File Name: 00a0374p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BARDEN DETROIT CASINO,
L.L.C., a Michigan Limited
Liability Company,
    *Plaintiff-Appellant,*

v.

THE CITY OF DETROIT, *et al.,*
    *Defendants-Appellees.*

No. 99-1969

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-72655—Gerald E. Rosen, District Judge.

Argued: September 15, 2000

Decided and Filed: October 23, 2000

Before: NELSON and MOORE, Circuit Judges;
WILHOIT, Chief District Judge.[*]

---

[*] The Honorable Henry R. Wilhoit, Jr., Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

—————————————

**COUNSEL**

**ARGUED:**  Robert M. Carson, CARSON FISCHER, Birmingham, Michigan, for Appellant.  Morley Witus, BARRIS, SCOTT, DENN & DRIKER, Detroit, Michigan, Eric J. Eggan, CASINO CONTROL DIVISION, Lansing, Michigan, for Appellees.  **ON BRIEF:**  Robert M. Carson, Michelle C. Didorosi, CARSON FISCHER, Birmingham, Michigan, Arthur R. Miller, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellant.  Eugene Driker, BARRIS, SCOTT, DENN & DRIKER, Detroit, Michigan, Eric J. Eggan, CASINO CONTROL DIVISION, Lansing, Michigan, for Appellees.

—————————————

**OPINION**

—————————————

   DAVID A. NELSON, Circuit Judge.  This is an appeal from a district court decision rebuffing a challenge to the constitutionality of a legalized casino gambling scheme adopted by the City of Detroit.  A city ordinance allowed the mayor to give preference in the casino licensing process to applicants that had campaigned on behalf of a voter initiative legalizing casinos.  Contending that this preference (as well as a similar preference in the Michigan state code) represented an unconstitutional condition, Barden Detroit Casino, L.L.C., sued the city, the mayor and city council, and the individual members of the council, as well as the State of Michigan Gaming Control Board and its individual members, seeking injunctive, declaratory, and monetary relief.  In a decision published as *Barden Detroit Casino, L.L.C. v. City of Detroit*, 59 F.Supp.2d 641 (E.D. Mich. 1999), the district court denied relief and dismissed the case.  The court held that there was no case or controversy as far as the state defendants were concerned, the state law preference having become inoperative, and it held that Barden was barred from

*County Commissioners v. Umbehr*, 518 U.S. 668 (1996); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980). The United States District Court for the Western District of Michigan has nonetheless upheld the Detroit ordinance against strict scrutiny challenges in the *Lac Vieux* case, *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, No. 2:97-CV-67 (W.D. Mich., Jul. 17, 2000), *appeal docketed*, No. 00-1879 (6th Cir. Aug. 8, 2000), and we intimate no opinion one way or the other as to the correctness of that decision.

As for the validity of the release, we observe that waivers of constitutional rights are not to be presumed lightly. See, *e.g.*, *D.H. Overmayer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972); *Brookhart v. Janis*, 384 U.S. 1, 4 (1966); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Ohio Bell Tel. Co. v. Public Utils. Comm'n*, 301 U.S. 292, 307 (1937) ("We do not presume acquiescence in the loss of fundamental rights"). Insistence upon execution of the release as a condition of participation in the selection process may or may not be constitutional, but Barden would be out of the running in any event.

The dismissal of Barden's lawsuit is **AFFIRMED.**

suing the Detroit defendants by reason of the fact that Barden had signed a release of all claims against them.

We agree that Barden has no standing to sue the state defendants. Without reaching the question of the enforceability of the release, we conclude that Barden likewise has no standing to sue the Detroit defendants, the plaintiff having suffered no injury-in-fact at their hands. The dismissal of Barden's suit will be affirmed on that basis.

I

A.    The Ballot Initiative and the Act

Late in 1996 the voters of Michigan approved "Proposal E," a state ballot initiative for the legalization of casino gambling. To codify this initiative the legislature passed the Michigan Gaming Control and Revenue Act. (M.C.L. §§ 432.201 *et seq*.) The Act established the Michigan Gaming Control Board as the body authorized to license the operation of casinos in Michigan. The Act had the effect of limiting casino development to the City of Detroit, because it provided that casinos could operate only in cities: 1) with a population of over 800,000, 2) located within 100 miles of another state or country in which gaming was permitted as of Dec. 5, 1996, and 3) where a majority of voters had already approved gaming in the city. (*Id.* § 432.202(1)). Detroit was the only city in Michigan that met these qualifications.

B.    The State Preference

The Act set out licensing procedures which, in their original form, exempted certain preferred developers from the competitive bidding process and allowed a tie-breaking preference for applicants that had provided political support for an initiative legalizing casino gaming:

"(a) The board shall issue a license to operate a casino to an applicant upon a determination by the board that the applicant is eligible for a casino license. The board shall

find that an applicant is eligible for a casino license if all of the following criteria are met:

(1) prior to the date of application: (i) the applicant or its affiliates or affiliated companies was the initiator of any casino gaming proposal submitted for voter approval in the city in which the casino will be located and the voters approved the proposal; or (ii) the applicant was selected by the city pursuant to a competitive bidding process.

\* \* \*

"(b) No more than three (3) licenses shall be issued by the board in any city. In the event that more than three (3) applicants meet the criteria provided for in Section 6(a) of this Act, licenses shall first be issued to applicants which submitted any casino gaming proposal for voter approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal." (M.C.L.A. § 432.206 (1996) (subsequently amended in 1997)).

As of July 17, 1997, however, § 432.206(a) was amended to eliminate the exemption from the competitive bidding process. Moreover, the tie-breaking preference was effectively neutered by the addition of a new subsection, § 432.206(2). As amended, § 432.206 now reads:

"(1) The board shall issue a casino license to a person who applies for a license . . . who the board determines is eligible and suitable to receive a casino license under this act and the rules promulgated by the board. . . . A person is eligible to apply for a casino license if all of the following criteria are met:

(a) The applicant proposes to locate the casino in a city where the local legislative body enacted an ordinance approving casino gaming that may include local ordinances governing casino operations,

*of Wildlife*, 504 U.S. 555, 560. Here the preference established by the Detroit ordinance caused no actual injury to Barden, the preference not having been invoked until after Barden had already been eliminated from the bidding. It was on Nov. 7, 1997, that the mayor narrowed the field to four developers – Atwater, Greektown, MGM, and Mirage – thus eliminating Barden. But the mayor had not yet applied the preference. The mayor testified "unequivocally," as we have seen, that even though Atwater and Greektown were eligible for preferences throughout the RFP process, he gave no preference to either of them until the field was reduced from four to the final three by the elimination of Mirage. *Barden*, 59 F.Supp.2d at 650. If the mayor's testimony is true (and we have been given no reason to believe it is not), the preference provision did not operate to the detriment of Barden at all. Greektown – the only developer adversely affected by the provision – might be able to allege an injury-in-fact; on the evidence before us, Barden cannot.

This is not to suggest endorsement of either the preference provision or the release that prospective casino operators were required to sign. As for the ordinance itself, *Lac Vieux* held that it was subject to strict scrutiny on two counts. First Amendment strict scrutiny was held applicable because the ordinance conditions a governmental preference on political support for gaming initiatives (a content-based distinction). *Lac Vieux*, 172 F.3d at 409 (citing *Frisby v. Schultz*, 487 U.S. 474, 481 (1988)). Equal protection strict scrutiny was held applicable because the ordinance implicates a fundamental right – that of free speech. *Id.* at 410 (citing *Carey v. Brown*, 447 U.S. 455, 461 - 62 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized")). And the preference prescribed by the Detroit ordinance may not be too far removed from the sort of political patronage that the Supreme Court has repeatedly held unconstitutional. See *Board of*

use of the Ordinance Preference."[2]   The district court's discussion of this argument bears repeating:

> "While this is a creative argument, the statutory language simply does not support [Barden's] incorporation theory. By its express terms, the Act governs only the state licensing . . . leaving to the City of Detroit the responsibility for selecting those developers with whom it wished to enter into development agreements. The Act does not directly incorporate the Ordinance or for that matter enumerate any criteria governing the City's selection of developers. Indeed, the Act contains no language whatsoever even suggesting that the Detroit City Council was required to enact an ordinance governing the selection of those developers with whom the City wished to negotiate development agreements . . . . Given this clear delineation of authority between the Act and the Ordinance, [Barden] cannot bootstrap the Ordinance preferences into the Act, particularly when the State took measures to cure any potential constitutional infirmities in its Act through the 1997 amendments to the statute as originally enacted." (*Barden*, 59 F.Supp.2d at 671 - 72.)

We agree. And we note again that even if it could be shown that the state had somehow "ratified" or "approved" the Detroit preference, Barden would still lack standing to sue the state in light of the fact that (as explained below) the preference was never applied to Barden's detriment.

C.   The Detroit Ordinance and the Release

To establish standing, a prospective plaintiff must demonstrate an "injury in fact" that is both "concrete and particularized" and "actual or imminent." *Lujan v. Defenders*

---

[2]As the state's brief observes, the state Board would have no authority to hold city ordinances unconstitutional even if it wanted to do so.

occupational licensees and suppliers which are consistent with this act and rules promulgated by the board.

(b) The applicant entered into a *certified development agreement* with the city where the local legislative body enacted an ordinance approving casino gaming.

(c) The applicant or its affiliates or affiliated companies has a history of, or a bona fide plan for, either investment or community involvement in the city where the casino will be located.

"(2) *A city shall not certify or submit and have pending before the board more than 3 certified development agreements.* If an applicant is denied a casino license by the board, the city may then certify a development agreement with another applicant and submit the certified development agreement to the board. Nothing in this act shall be construed to prevent the city from entering into more than 3 development agreements.

"(3) No more than three (3) licenses shall be issued by the board in any city . . . . In evaluating the eligibility and suitability of all applicants under the standards provided in this act, the board shall establish and apply the standards to all applicants in a consistent and uniform manner. *In the event that more than three (3) applicants meet the standards for eligibility and suitability provided for in subsection (4) and (5), licenses shall first be issued to those eligible and suitable applicants which submitted any casino gaming proposal for approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal.*" M.C.L.A. § 432.206 (emphasis added).

The state law preference is thus to be used only when there are more than three eligible applicants at once – and there can *never* be more than three eligible applicants at once, given the

prohibition against more than three certified development agreements. We have heretofore construed this section as effectively eliminating the preference. See *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999). In holding that the plaintiffs in that case lacked standing to challenge the state law, the *Lac Vieux* panel observed that "[i]f the preference is ineffective, then there can be no injury and no 'case or controversy.'" *Id.* In the case at bar, citing *Lac Vieux*, the district court likewise denied Barden standing to challenge the Act's preference provision. *Barden*, 59 F.Supp.2d at 670 - 71. For reasons to which we shall turn presently, we see no error in this.

### C.   The City Ordinance

In the summer of 1997 the Detroit City Council adopted an Ordinance establishing the Casino Development Competitive Selection Process. As codified in Detroit City Code § 18-13, the ordinance authorizes the Detroit mayor to select three developers to enter into certified development agreements. In order to be considered, the developers are required to participate in a competitive request-for-proposal process, or "RFP/Q" as it has been called throughout this litigation. The Ordinance also establishes a preference for developers who campaigned for the Detroit gaming initiative:

"In selecting developers of casinos, it is in the best interest of the city to provide a preference to those developers who took the initiative to facilitate the development of casino gaming in the City of Detroit by proposing a casino gaming proposal approved by the voters of the city (City Ordinance 15-94 and 16-94) and who actively promoted and significantly supported the state initiative authorizing gaming." Detroit City Code § 18-13-1(i).

Section 18-13-2 defines "preference" as a "more favorable position given to one prospective developer over another in

### B.   The State Act – *Lac Vieux*'s bar to standing

As *Lac Vieux* held, the 1997 amendment to § 432.206 of the Michigan Gaming Act rendered the preference provision of that act inoperative. No one can have standing to challenge the preference provision, therefore, because no one can be injured by it. *Lac Vieux*, 172 F.3d at 406, 408. Barden argues that it should be accorded standing nonetheless.

First, Barden argues that the state defendants have "taken numerous actions in ratification of, and to implement the decisions made by," the Detroit defendants. The district court ably analyzed this argument, noting that well-established Michigan law accords a strong presumption of constitutionality to local ordinances. *Barden*, 59 F.Supp.2d at 672 (citing *Cady v. City of Detroit*, 289 Mich. 499, 505, 286 N.W. 805, 807 (1933)).[1] That being so, and given that no court had ever held the Detroit ordinance unconstitutional, the Michigan Gaming Control Board was justified under state law in "presuming the constitutionality of the Ordinance and proceeding with the investigation of the selected developers' license applications." *Id.* If Barden suffered no actual injury as a result of decisions made under the city ordinance, moreover, "ratification" of such decisions by the control board could not have injured Barden.

Barden then asserts that the State Act "expressly incorporates the unconstitutional Ordinance," and that because the preferential language of § 432.206 of the Act is retained – even though it may be inoperative – the language "demonstrates the State Defendants' approval, ratification, and encouragement of the Detroit Defendants' application and

---

[1] Moreover, the Executive Director of the Michigan Gaming Control Board testified that the state Board has discretion in deciding who will receive a state license and that Detroit's preference "has no relevance whatsoever to the licensing process."

defendants moved for summary judgment. The court "ordered the trial of this case, with respect to the final merits of [Barden's] request for injunctive relief, advanced and consolidated with the hearing on Plaintiff's Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a)(2)." *Barden*, 59 F.Supp.2d at 644. The hearing was followed by issuance of the judgment challenged here on appeal.

## II

### A. Standard of Review

Like most issues in this hotly contested case, even the standard of review is in dispute. Barden asserts that because summary judgment was granted against it, our review should be *de novo*, with all justifiable inferences being drawn in Barden's favor. In this connection Barden cites *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992).

Detroit, on the other hand, argues that our review should be for clear error as to factual findings and *de novo* for conclusions of law only, the district court having conducted a trial under Rule 65(a)(2) and having made factual findings based on the evidence. The city cites *Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675, 677 (6th Cir. 1994), *aff'd* 515 U.S. 753 (1995).

We agree with Detroit. As the district court noted, the advancement of the trial and consolidation with the hearing on the preliminary injunction had been ordered "without objection from the parties." *Barden*, 59 F.Supp.2d at 644. *Pinette* clearly holds that although the denial of an injunction is normally reviewed under an abuse-of-discretion standard, a different standard applies when "the district court combined the hearing on the injunction with a trial on the merits under Fed. R. Civ. P. 65(a)(2);" in that situation we "review the district court's findings of fact for clear error under Fed. R. Civ. P. 52 and its conclusions of law *de novo*." *Pinette*, 30 F.3d at 677.

the process established to select a designated developer." The Ordinance goes on to describe how the mayor should administer the preference:

"(a) In considering proposals and in selecting a prospective developer with whom the mayor or his designee will negotiate a development agreement, a prospective developer is entitled to a preference if:

(1) Its proposal meets the criteria established by this chapter and by the request for proposals;

(2) It was the initiator of a casino gaming proposal which was approved by the voters of this city prior to January 1, 1995; and

(3) It made significant contributions to the development of gaming within the city by actively promoting and significantly supporting a state initiative authorizing gaming.

"(b) Notwithstanding any other provision of this chapter, no more than one preference shall be awarded to prospective developers who proposed city Ordinance No. 15-94, even if more than one prospective developer claims entitlement to such preference.

"(c) Notwithstanding any other provision of this chapter, no more than one preference shall be awarded to prospective developers who proposed city Ordinance No. 16-94, even if more than one prospective developer claims entitlement to such preference." Detroit City Code § 18-13-6.

### D. The Selection Process and the Release

The competitive selection process established pursuant to the ordinance was divided into two stages, called RFP I and RFP II. Under RFP I a prospective developer was required to

submit a detailed proposal and a $50,000 fee by Aug. 1, 1997. Eleven developers, including Barden, participated in RFP I.

Each developer was also required to sign a Consent and Release form. The form, which is quoted in its entirety at *Barden*, 59 F.Supp.2d at 648 - 49, provided terms for the use of confidential information about or submitted by each of the prospective developers. Paragraph 11 of the Release also provided for a release of all claims that might arise out of the competitive selection process itself:

"11. The Releasor, and his, her or its heir[s], executors, administrators, successors and assigns, hereby release the City of Detroit including all departments, agencies and commissions thereof, and their respective principals, agents, consultants, attorneys, advisors, employees, officers and directors (the "Releasees"), and hold each of them harmless from any damages, claims, rights, liabilities, or causes of action, which the Releasor ever had, now has, may have or claim to have, in law or in equity, against any or all of the Releasees, arising out of or directly or indirectly related to the (i) RFP/Q process and the selection and evaluation of Proposals submitted in connection therewith; (ii) release or disclosure of any information whether intentional or unintentional; and (iii) use, investigation of, or processing of the Information." *Id.*

As found by the district court, Barden's principal signed the Consent and Release one time on July 25, 1997, and twenty times on August 1, 1997. *Id.* at n.11.

On August 23, 1997, the mayor of Detroit selected seven of the 11 developers to move on to the next stage, RFP II. Barden was one of the seven, and, like the others selected at this stage, it submitted a further proposal along with a $250,000 fee.

On Nov. 7, 1997, the mayor narrowed the field to four developers – Detroit Entertainment, L.L.C. ("Atwater"),

Greektown Casino, L.L.C. ("Greektown"), MGM Grand Detroit, L.L.C. ("MGM"), and MCD Gaming Corp. ("Mirage") – thus eliminating Barden from consideration. On Nov. 20, 1997, the mayor announced a decision to negotiate certified development agreements with Atwater, Greektown, and MGM. The district court observed that in a deposition given on June 24, 1999, the mayor "unequivocally testified" that even though Atwater and Greektown were eligible for preferences throughout the RFP process, they received no preference whatever until the field was reduced from four to the final three. (Greektown received a preference over Mirage at this stage.) *Barden*, 59 F.Supp.2d at 650. No preference was applied at any stage until after Barden had already been eliminated from the competition.

Following selection of the final three, Detroit negotiated development agreements with Atwater, Greektown, and MGM. The agreements were executed on March 12, 1998. Each of the three developers began construction of a temporary casino sometime between Nov. 20, 1998, and Feb. 8, 1999. Each developer has paid a $3.66 million municipal services fee to Detroit and has invested heavily in construction; the chairman of MGM testified that MGM had spent over $80 million as of March 31, 1999, and was looking at a total cost of over $200 million. *Barden*, 59 F.Supp.2d at 653 n.17.

Barden brought the present lawsuit on May 25, 1999, claiming that the Detroit ordinance and the state act violated constitutionally guaranteed rights to free speech, equal protection of the laws, and "substantive" due process, as well as the Michigan Constitution's prohibition against special legislation. Barden also asserted a variety of contract and tort claims.

On the day the complaint was filed Barden moved for a preliminary injunction, asking the district court to declare the state Act and the Detroit ordinance unconstitutional and to enjoin the opening of any casinos. Both the Detroit and state